CREAMERY PACKAGE MANUFACTURING COMPANY, Appellant, v. BENTON COUNTY CREAMERY COMPANY, CHESTER A. HODGE AND L. C. EGGLESTON.

Sales: DELAY IN FURNISHING MACHINERY: SPECULATIVE DAMAGES,
1    Mere delay in furnishing machinery which does not interrupt an established business will not sustain an action for damages for loss of patronage.

Breach of Warranty: Excuses For: Evidence. Where one in-
2    stalls an ice plant in a creamery building under a contract of warranty, with a knowledge of the size and character of the building, to be accepted by the purchaser upon completion and trial if satisfactory to him, a breach of the warranty is not excused by reason of any claimed defect in the construction of the building.

Failure of Warranty: ACCEPTANCE: EVIDENCE. Evidence in an
3    action to recover the price of an ice plant installed in a creamery building under a contract of warranty providing for a trial, and if found to comply with the warranty the purchaser should accept it, is considered and held to show failure of the warranty and that the plant was never accepted.

Construction of the Word "Receipts." In an indorsement on a
4    contract for the purchase of machinery it was provided that the purchaser should reserve a certain amount from the "daily receipts" of the business and remit the balance to apply on the purchase price of the machinery. *Held*, that the word "receipts" meant the gross receipts of the business.

*Appeal from Benton District Court.* —HON. G. W. BURN-
HAM, Judge.

FRIDAY, MAY 22, 1903.

ACTION for purchase price of machinery contracted for, and the establishment of a mechanic's lien. The answer put in issue the allegations of the petition, and pleaded a counterclaim. A balance of $610.50 was found due plaintiff, and a decree entered accordingly. Both parties appeal, that of plaintiff being first perfected.— *Modified.*

*J. T. Sullivan* for appellant.

*Gilchrist, Whipple & Brown* for appellees.

LADD, J.—Prior to March 4, 1899, the Benton County Creamery Company, a copartnership composed of Chester A. Hodge and L. C. Eggleston, was engaged in establishing a creamery at Vinton. A building for that purpose was nearly completed. A canvass had been made, and oral agreements entered into with farmers, by whom the milk of ten or twelve hundred cows had been pledged on condition that, beginning May 1st, it should be taken at the farms, and, after the separation of the butter fat therefrom, the skim milk returned, and the expenses incident to making the butter, shipping, and marketing it paid, all at a cost to them of four cents per pound, they to receive the balance obtained for the butter. To carry out their part of the arrangement, the defendants had employed a butter maker at $50 per month, and men with teams to haul the milk on various routes, all to commence work May 1st. Some correspondence had been had with plaintiff, and on March 4, 1899, acting through an agent, Pattiani, it contracted to furnish defendants an outfit for said creamery for $1,625, to be shipped "at any time designated by second party after three weeks from date thereof and before sixty days from date thereof." The agent was fully informed of the arrangements detailed, and of the necessity of having the creamery ready for operation by May 1st. On the 14th of April the machinery for an ice plant was bought through the same agent, on the representation that the creamery outfit was ready for shipment, and that the refrigerator machinery, except some coils and tanks, was also ready, and all save these would be placed in a car and forwarded within forty-eight hours. This is denied by the agent, but satisfactorily established by other evidence. Had the shipment been made as proposed, the

defendants might have opened their creamery on the day expected, though the ice plant might not have been entirely completed by that time. Instead of loading all in one car, the articles were separately shipped from the 1st to the 15th of May, and plaintiff's expert did not arrive until May 17th. From ten days to two weeks are ordinarily required to place such machinery, and the ice plant was not in readiness for operation until June 5th. In the meantime many of the promised patrons of the creamery, being relieved from their obligation by failure to open on May 1st or within a reasonable time thereafter, delivered their milk to other parties; and defendant, instead of receiving from ten to twenty thousand pounds of milk per day, as the evidence tended to show they would have done had the creamery been ready May 1st, had in fact taken in but five hundred pounds. To secure the return of part of their customers, even, they were compelled to do the work at a greatly reduced price. The defendants demanded in their counterclaim the payment of damages owing to the breach of the condition of the contract fixing the time of delivery. The objection interposed is that prospective profits of this character are too uncertain, remote, and speculative to furnish a basis of compensation.

Recovery of anticipated profits was generally denied in the earlier decisions. An exception seems to have been first made in the case of torts. *Gibson v. Fischer*, 68 Iowa, 29. Later such profits were allowed, when the object of the contract, or fairly within the contemplation of the parties, and their loss was the direct consequence of the breach. *Hirschorn v. Bradley*, 117 Iowa, 130; *Rule v. McGregor*, 117 Iowa, 419. In the two cases last cited the agreements had for their design profits to be derived directly therefrom. In others the character of the agreement may be such as to advise the parties of the precise nature of the loss likely to flow directly from a failure to fulfill, as the

1. DELAY in furnishing machinery: speculative damages.

interruption of an established buisness, as was pointed out in the leading case of *Hadley v. Baxendale*, 9 Exch. 341. But in others there may be a loss of prospective profits, which, owing to the impossibility of ascertaining whether resulting directly from the failure to perform, or the relative loss therefrom as compared with other causes, are rejected by the courts as a measure of damages, because of being too uncertain and conjectural for the practical administration of justice. The chief difficulty in distinguishing between the two latter classes is in determining whether the alleged loss of profits resulted directly from the breach of the agreement. If it does, and it was within the contemplation of the parties, the better opinion seems to be that the profits which would in all reasonable probability have been acquired but for such breach should be awarded; otherwise recovery is to be denied unless some other measure of damages, as the reasonable value of the use lost, is available.

Turning now to the case at bar, it is to be observed that neither the making of profits, nor providing the opportunity to do so, formed a part of the contract. No doubt, the ultimate purpose of all business enterprise is the derivation of some advantage through the investment of labor or capital, or both; but, when the manufacturer engages to supply machinery for a plant, it is no part of the contract that a profitable business shall be carried on by the machinery furnished. If there be delay, he may be responsible for the loss of the use, or possibly for interest on the investment, where there is no rental value, but not for loss of profits in the business proposed, which necessarily are contingent upon many circumstances, and which might or might not have been made. *Penneypacker v. Jones*, 106 Pa. 237, 242; *Mining Syndicate v. Fraser*, 130 U. S. 611 (9 Sup. Ct. Rep. 665, 32 L. Ed. 1031); *Howard v. Stillwell*, 139 U. S. 199 (11 Sup. Ct. Rep. 500, 35 L. Ed. 147). Moreover, this enterprise was new, and exper-

ience had furnished no criterion by which to estimate the probable profits. See *Goebel v. Hough*, 26 Minn. 252 (2 N. W. Rep. 847); *Cushing v. Seymour*, 30 Minn. 305 (15 N W. Rep. 249); *Paola Gas Co. v. Paola Glass Co.*, 56 Kan. 614 (44 Pac. Rep. 621, 54 Am. St. Rep. 598). Those to be derived by defendants from the operation of the creamery depended so largely upon its management, the acquirement and continuance of patronage, the conditions of the butter market, and other considerations, that it would be exceedingly difficult, if not utterly impossible, to ascertain with any degree of accuracy the fruits of the enterprise lost by reason of the delays complained of. Even where the direct object of a contract, it is not easy, as was observed in *Ru'e v. McGregor*, to fix upon a satisfactory estimate. But without further discussion, it is perhaps enough to say that for the mere delay in furnishing machinery which does not interrupt an established business, according to the settled doctrine of this court, prospective profits cannot be allowed by way of damages. *Brownwell v. Chapman*, 84 Iowa, 504; *Novelty Ironworks v. Oatmeal Co.*, 88 Iowa, 524.

II. Under the contract the plaintiff was to erect the ice plant in "first-class order" in the creamery, with coils necessary "for the proper cooling" of four rooms, in each of which a tank was to be placed, "adapted in size and construction to aid in maintaining a uniform degree of refrigeration," and to be well and thoroughly constructed, of suitable material, and "brine-tight." Upon the completion of the ice plant, it was further stipulated that plaintiff was "to operate it six days, and in this time to produce the temperature agreed upon"; that it would "cool the rooms alone to the temperature named in from five to six hours' run, and will cool seven hundred pounds of butter introduced in the cooler, and one thousand five hundred pounds of cream run over the Blair cooler, in one and one-half hours' longer run"; and that "if, upon com-

pletion of the above-mentioned trial, the plant is found to fill in all respects the terms of this proposition, the defendant shall thereupon accept the same."

The evidence conclusively shows that the tanks were not "brine-tight," and that a test such as agreed upon was never made. As constructed, it was incapable of cooling the rooms within the time specified. There was but two-thirds as much coil, through which the ammonia passed, as was necessary to properly cool the brine in the tanks. The tanks were not heavy enough material, nor sufficiently supported. There were many defective valves, and ammonia constantly leaked from the system. There was constant dripping from the tanks, and the atmosphere in the rooms was loaded with moisture. Plaintiff virtually concedes that the plant did not comply with the contract, and interposes a series of excuses. It is first contended that the building was not properly insulated. The evidence shows the contrary. Next it is said that a sufficient foundation for the compressor was not provided, but plaintiff failed to furnish specifications therefor as agreed, and its agent approved that provided. Thirdly it insisted that defendant prevented the construction of a false ceiling in the churn and cream rooms. This may be conceded. Such ceiling was not mentioned in the plans. The height of the rooms was stated in the contract, and the coils through which the ammonia passed as it expanded were to be sufficient to maintain the temperature at fifty-five degrees Fahrenheit at the ceiling of the cream and churn rooms, and thirty-five degrees in the storage rooms; thus negativing all notion of additional ceilings. The false ceiling would inclose the brine tank, and exclude it from the air below, but manifestly would not produce cold. That is done by the coils through which ammonia circulates, and the brine tanks store it. The erection of these ceilings would merely reduce the air space of the room,

*2. Breach of warranty: excuses for: evidence.*

and help to better confine and control the cold air. But the rooms as they existed were to be cooled, and ceilings such as were proposed were not contemplated in making the contract. The suggestion of them was an afterthought —a makeshift conceived to counteract the results of a defective plant.

But it is argued that, notwithstanding all this, the ice plant was accepted. It is said that defendants prevented the completion of the plant. The evidence fails to establish this. Hodge wrote plantiff May 15th, reviewing its shortcomings, and indicating the necessity of an adjustment. In response, McNish, acting for plaintiff, visited defendants, and was plainly told that the machinery would not be accepted. To induce defendants to remove a part of it from the railroad depot, and allow plaintiff to erect the ice plant as proposed, a change in the method of payment was agreed upon; and McNish undertook to send Pattiani, the salesman, to aid in inducing the return of the patrons, and to adjust the damages defendants had suffered by reason of plaintiff's delay in shipping the property. True, McNish, while admitting that he recognized that defendants had suffered damages because of the delay, and that he discussed the amount which ought to be allowed, denies that he agreed that Pattiani should make settlement. The clear weight of the evidence, however, is to the contrary, and, further, that Pattiani actually saw the farmers as proposed, and negotiated with defendants for the settlement of their damages. With this understanding, the creamery began operation June 5th. It was several days thereafter that plaintiff's expert first suggested the false ceiling. As previously indicated, the defendants were under no obligation to permit its construction. The evidence leaves no doubt but that this was the only obstacle interposed to the completion of the plant, though some of plaintiff's witnesses evidently construe refusal to allow its

3. FAILURE of warranty: acceptance; evidence.

construction as preventing the plant from being put in proper condition. This ceiling was the subject under discussion, and what Hodge said must be construed with reference thereto. When Pattiani came, on July 22, Hodge advised him "to go ahead and do whatever was necessary to make the plant right." This was at first admitted by Pattiani, but afterwards he was unable to recollect it. Woodring was not allowed to meddle with the plant in October, for the reason that plaintiff's attorney had directed defendants to recognize no one without credentials as representing plaintiff.

It is urged, however, that defendants have made use of the plant as their own. It was in pursuance of the understanding had with McNish that the machinery was taken from the depot, and plaintiff's expert permitted to place it. There is no question but that he left it without making the test stipulated, and we think that defendants undertook to operate it, at the express invitation of Pattiani, until he could send a man to complete it. While the latter denied this, the testimony of Hodge to that effect is confirmed by Eggleston and all the circumstances of the case. The plant was merely left in defendants' care, and was so continued by plaintiff's attorney. The purpose in employing the expert, Affleck, was to ascertain its condition, and not to mend it for use.

Appellant also claims that lien on the property for damage was asserted by coupling the demand that the machinery be removed with a request that the damages for delay be settled. Evidently counsel overlooks the fact that the contract is in the nature of a proposal, the consummation being dependent on the defendants' acceptance. Nothing is shown to have been written or said which can be fairly construed as a demand for the payment of damages, as a condition precedent to such removal. We conclude that, as it did not comply with the conditions

of the contract, was never tested as agreed, and has not. been accepted, the defenJants are not liable for the price.

III.   By the terms of the contract entered into March. 4, 1899, the plaintiff guaranteed all the articles constituting the creamery outfit "to be of first quality in every respect." The evidence conclusively showed that the "ideal automatic skim-milk weigher," priced at $100, was worthless.   It is conceded that the sum of $144 advanced. for freight on the refrigerator machinery should be allowed defendants as an offset.   The weight of the evidence is to the effect that all the machinery was to be put in one car, rather than transported as separate articles, as was. done; and the difference in the expense, amounting to $62.50, was rightly allowed.   Three of the vats were de-- fective, and we are not inclined to reduce the damages. ($205) awarded by reason thereof.   Such articles, when not constructed as required, are ordinarily of little value.. As Hodge had investigated the prices of articles essential in making up a creamery outfit, he was, in a measure,. qualified to testify.   These articles were not received with full knowledge of their condition, and hence the authorities relied on by appellant are not in point.   See Berthold v. Seevers Mfg. Co., 89 Iowa, 506.

IV.   The defendants paid $500 on the contract, and should be allowed as damages $514.50.   This leaves a balance owing of $610.50.   The indorsement on the contract 4. CONSTRUC-   made by McNish, May 18, 1899, provided TION of word "receipts."   that "the Benton County Creamery Co. shall reserve seven dollars each day from their daily receipts and remit all receipts above this amount to the Creamery Package Mfg. Co., on the first of each month.   This clause covers receipts from both mill and creamery.   This agreement shall remain in force until the indebtedness shall be paid, or until another arrangement for payment may be made."   The receipts here contemplated are the gross receipts of defendants, the $7 evidently being allowed for

expenses incident to the operation, of the establishment. Were there any doubt about this, it is set at rest by the conversations had between the parties at the time. The evidence shows that not exceeding $7 per day was received by defendants until June, 1900. During that and the two months following, the receipts were $733.87. It is to be assumed that operation on Sunday was not contemplated, and hence $182 should be deducted from each month, or $546 for the three; and, under this stipulation, but the difference, of $187.87, was due the plaintiff. The petition asked for an accounting under this stipulation, and under it plaintiff should have been granted no more than above stated. The decree will be modified to this extent, and the cause remanded for further accounting in conformity with the stipulation with respect to payment.

Decree MODIFIED and cause REMANDED.