SWIFT & COMPANY, Appellant, v. C. W. REDHEAD.

**Sales:** FAILURE OF CONSIDERATION. Where, as in this case, stock food was sold for a particular purpose and upon representations that it was suitable for that purpose, upon which the purchaser relied, and which proved to be of no value for such use, there was a total failure of consideration.

**Same:** EVIDENCE. In this action for the price of stock food the evidence is held to sustain a finding that the same was not suitable for the purpose of fattening cattle as represented by the seller, but was in fact injurious and worthless for that purpose.

**Same:** WARRANTY. No particular form of words is necessary to constitute a warranty; it only being necessary that the parties understood from their conversation that a warranty was intended.

**Same:** EVIDENCE. In this action the evidence is held sufficient to take the question of whether the seller warranted the stock food to be suitable for fattening cattle to the jury.

**Same:** BREACH OF WARRANTY: DAMAGES.  In an action for the price of stock food sold on a warranty that it was suitable for fattening cattle, the defendant is entitled to recover the damages naturally growing out of the breach of warranty; so that while he can not recover anticipated profits growing out of the use of the food, there being no representation as to the amount of such profits, he can recover damages caused by using the food, where the evidence shows that his cattle lost flesh when fed upon it and gained flesh when using other ordinary feed; such evidence showing damage with reasonable certainty.

**Same:** WAIVER OF RIGHT TO DAMAGES: EVIDENCE.  A purchaser of stock food can not recover damages caused by feeding the same after he fully learned of its injurious effects, even though advised by the agent of the seller to keep trying it and see if he could not determine the right amount to use; the agent not being authorized to give such advice and it being merely advice to experiment with the same. In this action the evidence is held to show that defendant learned of the injurious effects of the food shortly after using it and that he continued to feed the same with such knowledge.

**Same:** EVIDENCE: ADMISSIONS OF AGENT.  Statements of plaintiff's agent concerning the quality of the stock food and its continued use, made long after the sale and when he was not engaged in the performance of any duty within the scope of his employment, were not binding upon the plaintiff. And as he had neither examined the food, nor investigated the condition of the cattle to which it had been fed, as defendant knew, and had given no opinion of its effect based on information, his advice to keep trying it and see if the right amount to feed could not be determined, amounted simply to a suggestion that defendant conduct an experiment; and evidence of such suggestion was not admissible as bearing on defendant's conduct in continuing to use the food after discovering its injurious effects.

*Appeal from Polk District Court.*—HON. JESSE A. MILLER, Judge.

THURSDAY, JULY 1, 1909.

REHEARING DENIED, MONDAY, APRIL 11, 1910.

On December 24, 1903, the defendant purchased of

plaintiff, through its agent, Hugh Van Pelt, about eight tons of blood meal at the agreed price of $383.52. The action was brought for this sum. For answer the defendant alleged: That the consideration had wholly failed, in that the so-called merchandise was a prepared form of the blood of domestic animals, represented by the plaintiff to be exceedingly valuable as a food for cattle, causing them to be and remain healthy and to rapidly take on fat and mature for market; that the same was a new product recently placed upon the market, the qualities of which were unknown to the defendant, and the plaintiff knew at the time that he ordered the same that he was wholly unfamiliar therewith:

And it was distinctly understood and agreed that he was not buying the same upon his own knowledge, but upon the knowledge, representations, and warranties of the plaintiff that the same was suitable, valuable, and profitable for the use aforesaid; that the defendant attempted to make such use thereof, carefully following the directions and instructions of the plaintiff in that behalf, but found, after giving the same a fair test, that the same was not only wholly worthless for such purpose, but was a positive injury and damage to his cattle. Whereupon he notified plaintiff of such facts and notified it that the remainder of said blood meal was in his custody subject to the order of the plaintiff and its officers, and so remained.

By way of counterclaim, it was averred: That plaintiff represented and warranted that said meal was scientifically prepared stock food, valuable and healthful, and would cause feeding cattle to become healthful and remain healthful and thrifty and accumulate fat much more rapidly than had been possible as the result of methods of feeding and treatment that generally prevailed up to the time of the invention and manufacture of such blood meal; that the defendant purchased said meal in reliance upon said representations and warranties for the purpose

of feeding a herd of some one hundred and twenty-one head of cattle then being prepared for the market; that plaintiff knew that such was the object of the purpose, and sold the same on said representations and warranties with knowledge that defendant was without information and relying thereon; that defendant in feeding said meal followed instructions, but it caused said cattle to sicken, suffer from scours, with the result that it retarded the acquisition of fat; that defendant then rescinded the contract of purchase; that the cattle were worth $4,830 less upon discontinuing the feeding of the meal than they would have been had it not been fed at all; and judgment was prayed for $1,615. In reply plaintiff interposed a general denial and averred that both parties acted with knowledge of the use and results of said meal, and there was no warranty as alleged. The trial resulted in a verdict and judgment as prayed in the counterclaim. The plaintiff appeals.—*Affirmed* on condition.

*B. F. Taft* and *Sullivan & Sullivan,* for appellant.

*Crom Bowen* and *O. M. Brockett,* for appellee.

LADD, J.—The defendant began feeding one hundred and forty three-year-old steers about December 1, 1903. They were grade short horns, polled Angus and Herefords, taken from the pasture in good condition. He began feeding them blood meal in the latter part of the month, up to which time the evidence tended to show they were thrifty and doing well. Thereafter, though well cared for, they scoured badly, and this continued as long as the meal was fed, which was about until the first of March, and thereupon the scouring ceased. According to the evidence, the cattle did not increase in weight to exceed seventy-five to one hundred pounds each during the sixty days they were given the blood meal; whereas, without

such food, like cattle ordinarily increase on full feed from one hundred and twenty to one hundred and fifty pounds a head in that time. It was also made to appear that, as such cattle fattened, they increase in value per pound. On this showing, in connection with other evidence, which will be referred to farther on, defendant asserted: (1) That the blood meal had proven to be utterly valueless, and therefore the consideration wholly failed; and (2) that he was entitled to recover the damages caused by feeding the same, measured as difference in the market value of the cattle at the end of sixty days' feeding thereof and such value of the cattle had such food not been given them. The jury might have found: That at that time "blood meal" was a comparatively recent preparation; that, though defendant knew of it in a general way, he had never used it and bought it to feed the "bunch" of cattle he then had on the recommendation of the plaintiff's agent; that the agent in selling it so knew and represented that it was a valuable food for cattle and would cause them to continue healthy and rapidly take on fat.

I.   As the sale was made for a specific purpose, on the assurance of the seller that the commodity with which the purchaser was unfamiliar, as was well known to the seller, was suitable for the purpose for which sold, and the purchaser in buying relied thereon, it goes without saying that, unless the article was of some value for such use there was a failure of consideration.

1. SALES: failure of consideration.

From the evidence adduced, the jury might have found not only that the "batch" of "blood meal" shipped to defendant was not suitable for cattle food, but that it was injurious to them, and therefore worthless for the purpose sold. This being so, the consideration as to that fed failed, and no recovery can be had for that on hand, as the jury also must have found that defendant advised plaintiff that the por-

2. SAME: evidence.

tion not fed was retained subject to its order. The second instruction was to this effect, and we do not understand counsel in their brief to challenge its correctness. If anything said under the heading "points in error" can be so construed, the point was not argued nor authorities cited thereon.

II. The counterclaim for damages was based on allegations of an express warranty, and the sufficiency of the evidence to sustain the verdict finding there was such a 3. SAME: warranty is challenged. No particular form warranty. of words is necessarily to be employed in order to constitute a warranty. All essential is that such was the understanding of the parties.

Here the evidence of defendant was that the agent recommended the blood meal very highly, and said that it was very fine food for cattle, that many were using it, 4. SAME: that it was valuable in preventing scours in evidence. calves, that it was a great deal better than cotton seed meal or oil meal and would produce flesh much quicker, that he had used it himself in feeding, that it would cause cattle to take on fat much more rapidly and keep them in good condition, that he figured out "how much quicker they would be ready for market and how much more they would gain." The agent denied having stated what effect the meal would have on cattle, or having compared it with cotton seed or linseed oil; but he admitted that he knew defendant was contemplating the purchase of cotton seed meal, that he pointed out the excess of protein in blood meal over cotton seed meal and induced him to purchase the blood meal, that he said blood meal was a preventive and cure for scours, and that he had practical knowledge on the subject. Quoting from his testimony:

I showed him where the Iowa Experiment Station had fed different bunches of steers with corn alone and with different commercial food, and in showing him this

I showed him that blood meal produced more profit than any other food fed in conjunction with grain, and further showing him Swift & Co. guaranteed eighty-seven percent of protein, which was a great deal larger percent than any other food stuff had, and that protein was evidently what he was wishing to buy when he bought cotton seed meal which contained thirty-seven percent, and blood meal contained eighty-seven percent and the difference on the total amount of protein contained in a ton of blood meal and a ton of cotton seed meal made blood meal the cheaper source of protein at the price at which I was selling it to him to be used in connection with their food to produce and maintain a healthful condition and facilitate the taking on of fat and to balance up the rations. Q. Did you tell him that the manufacturers represented this food contained this protein in this proportion and in such condition as that it could be used in connection with the other food as to get the proper balance or proportion of food ingredients and facilitate the maturity of the cattle for the market? A. When fed with corn. Q. Did you represent to him as your claim and the claim of the manufacturers that it was profitable to use this food in connection with the corn and other cattle foods, because so used it would cause the cattle to get fatter in the same length of time or else fatten quicker for the market? A. From what I said to him, he naturally would draw that conclusion. Q. That was one way to get him to buy, was it not? A. Certainly.

When to this evidence is added the circumstance that the agent was aware that defendant was without experience in the use of the meal, and was relying on his representations in making the purchase, it becomes evident that there was enough to carry the issue to the jury. *Hughes v. Funston,* 23 Iowa, 257; *Tewkesbury v. Bennett,* 31 Iowa, 83; *Conklin v. Standard Oil Co.,* 138 Iowa, 596. The jury might well have found that the purchase of the blood meal for a particular use known to the seller, and for which the latter assured the buyer it was suitable, and that the buyer relied thereon, and, if so, this amounted to a warranty that the article in ques-

tion was reasonably fit for the use both contemplated. 30 Am. & Eng. Ency. of Law, 144. Practically, this is as far as a warranty of merchandise ordinarily goes, and, aside from estimating the advantages of the commodity in detail, is as far as the plaintiff's representative went in this case. The object to be attained was the fattening of the cattle. The agent represented that the blood meal would accelerate the fattening, but did not indicate how much. So that what he said amounted to no more than a warranty that it was suitable for that purpose. If it was not suitable, and we are speaking of the blood meal actually delivered, and not of the preparation generally, then his principal is responsible for the consequences naturally flowing from a breach of the contract. But three of these can be conceived of, namely, the meal must have improved their condition, have injured them, or have produced no effect whatever; and surely these are consequences which the parties must have contemplated in making the bargain. In other words, the object of the contract was that the meal sold produced a particular effect, i. e., the laying on of fat by the cattle faster than they would without it, and thereby enhance the defendant's profits from feeding.

Of course, defendant could not recover for loss of the anticipated increase in profits, for there was no assurance as to the amount, and he is making no claim therefor. What he is demanding is the loss of profits which would have accrued from feeding in the ordinary way, but for the consumption of the blood meal; that is, for the injury occasioned by feeding an article not as warranted. Appellant contends that the damages, if any, are too uncertain and speculative for adjudication. Such is not the holding of the courts where injury has resulted from the use of an article warranted to be beneficial. As said, the claim is not for profits lost, but for damages due to the inter-

5. SAME: breach of warranty: damages.

ference .with the growth of the animals. That they in fact increased in value. when on full feed is not conclusive that eating the meal did not cause the injury complained of.

The law does not preclude the recovery of profits lost as the result of a breach of a contract having these as its object. *Hichorn v. Bradley,* 117 Iowa, 130; *Rule v. McGregor,* 117 Iowa, 419. See *Creamery Package Mfg. Co. v. Benton Co. Creamery,* 120 Iowa, 584. Nor does it deny to one who has purchased an article for a specific purpose damages naturally consequent upon it proving not to be as agreed. Thus in *Kent v. Halliday,* 23 R. I. 182 (49 Atl. 700), the petition alleged a warranty in the sale of paris green that it was pure and would kill potato bugs, that upon proper application it proved impure and not sufficiently strong to kill them, and that in consequence thereof plaintiff's potato crop was destroyed. The court held that a good cause of action was stated; it being a matter for determination on the trial whether the destruction of the crop was the natural and proximate consequence of the breach of warranty. *White v. Miller,* 71 N. Y. 118 (27 Am. Rep. 13), was an action on a warranty that a quantity of cabbage seed sold was pure, and, as the seed turned out to be impure, loss of probable profits was allowed; the court saying: "Gains prevented, as well as losses sustained, may be recovered as damages for a breach of contract where they can be rendered reasonably certain by evidence, and have naturally resulted from the breach. . . . The character of the season, whether favorable or unfavorable for production, the manner in which the plants set were cultivated, the condition of the ground, the results observed in the same vicinity where cabbages were planted under similar circumstances, the market value of Bristol cabbages when the crop matured, the value of the crop raised from defective seeds, these, and other circumstances, may be shown

to aid the jury and from which they can ascertain approximately the extent of the damages resulting from the loss of a crop of a particular kind." The decision no more than confirms *Passinger v. Thorburn,* 34 N. Y. 634 (90 Am. Dec. 753), where, in an action on a breach of warranty on sale of Bristol cabbage seed, complainant was allowed to recover as damages the difference between a crop raised from the defective seed and a crop of Bristol cabbage such as would ordinarily have been produced in the year in which the seed was to be sown. A like holding based on a sale of seed barley was had in *Randall v. Roper,* E. B. & E. 84. See, also, *Wolcott v. Mount,* 36 N. J. Law, 262 (13 Am. Rep. 438); *Ferris v. Comstock,* 33 Conn. 513; *Swain v. Schieffelin,* 134 N. Y. 471 (31 N. E. 1025, 18 L. R. A. 385). In *Jones v. George,* 56 Tex. 149 (42 Am. Rep. 689), the sale was of paris green to kill worms, and the court, though holding that recovery might be had on showing of breach of implied warranty for cost in purchase and application to cotton and loss of time and all other damages resulting as a natural consequence, but that what the cotton crop would have been had the worms been destroyed was purely conjectural and not to be taken into account.

No consideration was given to the foregoing and other authorities, however, and we need not stop to determine whether, in view of the circumstances of the case the conclusion is to be approved. It is very evident that a showing of damages to stock due to a particular feed is not involved in the uncertainties attendant upon the raising of a crop of barley, cabbage, potatoes, or cotton. The testimony of what cattle like those of defendant on full feed ordinarily would increase was undisputed, as was the evidence of what they in fact increased. It was shown that they had not scoured before eating the blood meal, that they did scour during the entire time it was fed to them, and that they ceased scouring when it was

finally taken from them. The care and feed otherwise was not changed, so that the inference fairly to be drawn was that their condition was caused by this feed, and that it had interfered with their growth to the extent indicated. As the cause was reasonably certain, the mere difficulty in ascertaining or measuring the damage will not justify the denial of the recovery thereof.

III. Conceding, however, that defendant might recover on proof of injury to the cattle, the evidence conclusively showed that he was aware of the injurious effect due to eating the blood meal within two days after he began feeding it. He testified that as long as he fed it the cattle scoured, and that they "did not seem to do any good at all," that he kept "thinking it would work all right, wanted to use the food if he possibly could, and thereafter kept on trying it, giving them little, and increasing it a little, trying in every way to get them to take the food so that it would do them some good." He testified further: "Just as soon as the cattle got the blood food, they commenced to scour. I should say within two days afterwards. I knew that something was acting bad with them and attributed it to the blood meal. We were only feeding them corn and hay at this time. As I said, we noticed the bad effect within two days; but we did not lessen or stop the use of the meal. In fact, we kept increasing it gradually. We could not get much relief in its effect, as they were just as bad on the start as they were later. It continued very bad, but I was trying the meal. . . . Until about the 23d of March, we used the blood meal, increasing and decreasing it off and on. It acted badly all the time. The only deleterious effect on the cattle shown was causing them to scour." This is that for which agent of plaintiff had expressly recommended the blood meal to be a preventative. Within a few days after receiving it, the defendant was as fully

6. SAME: waiver of right to damages: evidence.

advised as he was three months thereafter that the blood meal had precisely the opposite effect. Having information that the commodity was not as recommended, he must be held to have conducted the series of experiments following at his own risk. Surely the seller can not be held for damages flowing from the experiments of the feeder after he has become fully aware of the breach of the warranty. Doubtless, defendant was justified in continuing the feed for a short time reasonably sufficient to ascertain the result of its use; but, after this was definitely known, the seller ought not to be held responsible for any damage caused by feeding blood meal. The record affords no basis for a finding of damages, if any, which resulted from using the meal until the defendant knew of its effect on the cattle; the only proof bearing on the measure of damages indicating the difference in the value of the cattle about March 23d as they were and as they would have been but for the use of the meal. At the most, under the circumstances disclosed, defendant was entitled to no more than nominal damages.

IV. Evidence of declarations by plaintiff's agent, made several weeks after the sale was effected, was received over objection. Upon defendant's complaint that the blood meal caused the cattle to scour, the agent appears to have said that something must be wrong with it, but advised defendant to continue feeding it. In an instruction the court limited the consideration of this evidence to "determining the question as to what time the defendant, acting as a reasonably prudent man, should have discontinued the use of said blood meal after he ascertained how it affected the cattle." What the agent said was not binding on the plaintiff, for he was not then engaged in the performance of any duty within the scope of his employment. *Phelps v. James*, 86 Iowa, 398; *Sweetland v. Tel. Co.*, 27 Iowa, 433; *Metropolitan Bank v. Nat. Bank*,

7. Same: evidence: admission by agent.

104 Iowa, 682. It is insisted, however, that, as bearing on the defendant's conduct, what others might have said to him would have a material bearing on whether he acted prudently in continuing to feed the meal. Had the agent examined the meal, or had he investigated the condition of the cattle and given an opinion based on information, the case might have been different; but he had done neither, and, as he recognized the bad effects of the meal, his advice amounted to nothing else than suggesting to defendant that he experiment with the food. His advice to "keep trying it," and see if he could "get them up to the right amount," furnished no justification for defendant to continue in the use of the blood meal two or three months after he was fully aware of its injurious effects. As the advice of the agent was that defendant conduct an experiment, and not that the meal was good, or that the cattle were likely, in becoming accustomed to it, to do as had been assured in making the sale, evidence thereof was not admissible for the purpose mentioned in the instruction or any other.

V. Much is said in the argument of appellant concerning the general character of blood meal. We are not concerned in this case as to whether, as an article of food for animals, it is valuable or otherwise. Plaintiff was bound to furnish the commodity in compliance with the expressed warranty, if such there was, regardless of the character of the preparation generally, and this, as the evidence tended to show, it did not do.

Other matters argued, in view of our conclusion, need not be considered.

The result is that the finding that the consideration failed is sustained by the evidence, and that the verdict, in so far as based on the counterclaim, is not so sustained. If defendant shall elect to file a remittitur of the judgment in his favor in excess of nominal damages of $1 within thirty days after the filing of this opinion, the judgment

will be affirmed with one-half of the costs taxed to each party; otherwise the judgment will be reversed.

*Affirmed* on condition.