No. 37,641

TOPEKA MILL AND ELEVATOR COMPANY, a corporation, *Appellee*, v.
CLAUDE H. TRIPLETT and M. ESTHER TRIPLETT, doing business as
TRIPLETT LEGHORN FARM, *Appellants.*

(213 P. 2d 964)

Opinion filed January 28, 1950.

*Jacob A. Dickinson,* of Topeka, argued the cause, and *Edward Rooney*
and *David Prager,* both of Topeka, were with him on the briefs for the
appellants.

*John S. Dean, Jr.,* of Topeka, argued the cause, and was on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This action originated as one to recover the balance due on an account for the sale of chicken feed. Defendants filed an answer and cross petition in which they denied owing the plaintiff and sought damages from plaintiff by reason of alleged false and fraudulent representations concerning the feed in the sum of $7,500.

On the trial defendants stipulated if they were indebted to plaintiff in any amount then the amount sought by it, $2,077.63, was correct. The trial court sustained a demurrer to defendants' evidence. From that ruling and the order overruling their motion for a new trial defendants appeal. Our concern is, therefore, limited solely to a consideration of defendants' cross action for damages.

Claude H. Triplett and M. Esther Triplett, doing business as the Triplett Leghorn Farm, appellants, were the purchasers of the feed. The Topeka Mill and Elevator Company, appellee, was the seller of the feed.

In their cross petition appellants, in sustance, alleged: They raised Leghorn chickens for the purpose of producing and selling eggs and breeding Leghorn chickens; they built up their own strain of pedigreed stock under the supervision of the United States government pursuant to which a "record of performance" of each chicken was kept and maintained; prior to June, 1944, they used Purina feed and had a high "record of performance"; in June, 1944, O. J. Halstead, the agent and employee of appellee, represented to them that if they would use feed manufactured and furnished by appellee their production and "record of performance" would be maintained at its high level or increased; in reliance upon the representations they commenced to use appellee's feed; in December, 1944, the production and "record of performance" of the chickens fell off; they learned appellee was leaving certain ingredients out of the feed; they notified appellee of these facts; Paul Bailey, manager, and Frank Bryan, assistant manager, of appellee, falsely and fraudulently and with intent to induce appellants to continue use of the feed, represented that if appellants would continue its use the quality of the feed would immediately increase and the results would be as good as they ever had been and as they were when appellants used Purina; the representations were false and known

to be so; appellants relied upon the representations but the "record of performance" continued to decrease; they were unable to reproduce chickens from high producing ancestry and hence were unable to sell reproduced chickens at the high price they would have been able to do had the feed been as represented; as a result of the false and fraudulent representations made with the intent to defraud and to cause them to use the inferior feed appellants were damaged in the sum of $7,500.

We come now to the subject of proof. We shall endeavor to state the developments in their chronological order as nearly as the record permits.

The evidence, in substance, was: Appellants' business, a partnership, is owned by Mr. and Mrs. C. H. Triplett; Mrs. Triplett and a son, Roger, operated the business; Mrs. Triplett had been a poultry breeder for twelve years and since 1941 had carried on a "record of performance" production; O. J. Halstead, a salesman for appellee, was familiar with her record; Halstead first talked to her about changing from Purina to appellee's feed "Sun Gold" which she could purchase for somewhat less than Purina by getting it at wholesale prices; Halstead first suggested the change to her in June, 1944; he told her the feed could be bought for less than Purina and that appellee guaranteed it to give as good results as Purina; Halstead called on appellants about every week; she did not make the change in June but did make it three or four months later (some testimony indicates the change was made in August, 1944); Mrs. Triplett was the one who determined what feed to buy and to make the change; she finally decided to try the feed; appellants used the feed from August, 1944, to February, 1947, a period of approximately two years and seven months; they obtained good results from it for four to six months; in the summer of 1945 they noticed a change in the color, feel and smell of the feed; Mrs. Triplett complained to Halstead about it in the summer or fall of 1945 and he said the feed had been cheapened, that Jersey Balancer, which was a trade name for a mineral concentrate, had been left out; at the time Halstead so advised her he was no longer an employee of appellee; the feed had a yeasty smell and chickens did not like it; each bag of feed had a tag attached, as required by law, showing an analysis of the feed; Mrs. Triplett had six or eight conferences with representatives of the mill about the change in the feed; she talked to Mr. Bailey, Mr. Bryan and

Doctor Alford; Mr. Bailey told her on two or three occasions they expected to improve the feed, that they expected to increase the quality of the feed; this was the extent of the representations he made; Doctor Alford, appellee's veterinarian, told her appellee's feed was a balanced ration, the roosters were eating too much of the feed, the hen house was not clean enough, he thought the chickens were wormy, the feed was a balanced feed and they should not feed them buttermilk; appellants continued to feed the chickens buttermilk.

Mrs. Triplett was asked why she continued to use the feed until February, 1947, if she had discovered in the summer of 1945 the feed was not as represented. Her answer was:

"Well, after we had a bill with the feed company we didn't like to quit their feed as long as we owed them, and then they told us, of course, that the feed would be better and we could go ahead, so we just strung along with them thinking they would hit on something that would bring our flock back up."

Mrs. Triplett further testified, in substance: Immediately prior to switching back to Purina in February, 1947, they conducted a test with two pens of birds; in one pen they followed the recommendations made by appellee and had no results; in the other pen they fed the chickens Purina and within thirty days' time the chickens began to pick up and doubled their egg production.

Roger Triplett testified Halstead tried to induce appellants to use "Sun Gold" feed and stated it would do as good a job, or better, than Purina and at less cost. Roger's testimony was much the same as his mother's testimony with respect to first noticing the effect on the chickens but he stated that was in the latter part of 1945 and that he overheard a conversation at appellee's mill between Mr. Bailey, Mr. Bryan and a Mr. Favire which disclosed Jersey Balancer had been left out of the feed in the first part of 1945. On cross-examination he testified appellee stopped using Jersey Balancer in the spring of 1946.

He further testified, in substance: The next major change he noticed in the feed was in the summer of 1946 when he opened some feed and it smelled moldy and old; he returned it to the mill and complained to Mr. Bryan; Mr. Bryan told him the feed was neither old nor moldy, that a yeast enzyme was being put into the feed but it would make no change in its effectiveness; he (Roger) had noticed a change in the color and texture of the feed during the summer, fall and winter of 1946; he had numerous conferences with representa-

tives of the mill concerning the feed; Mr. Bryan and Doctor Alford came to make an inspection; Doctor Alford stated the hen houses were not clean enough, that buttermilk would throw the quality of "Sun Gold" feed off balance, and he felt the chickens were wormy but had no definite way of knowing they were wormy; he (Roger) examined the chickens for worms and found none but did not examine them for cecal worms which are invisible to the naked eye; as he remembered it they had carried out all of Doctor Alford's suggestions except the one to stop feeding buttermilk; Doctor Alford said buttermilk was useless and it was throwing the feed out of balance; Doctor Alford did not put any pressure on them to quit using buttermilk; no changes had been made in the method or operation of the hatchery since 1942 except the change in feed; he was unable to discover any cause for the loss of production other than the change in feed.

Roger Triplett also testified concerning the extent of decrease in the production during the time they used appellee's feed, the increase in production after they returned to the use of Purina and the total amount of damage suffered.

C. H. Triplett, the same as his wife, testified that Halstead guaranteed the feed to get as good results as the feed they had been using previously and that appellee's feed was cheaper; they bought the feed on appellee's guarantee; he also stated the production increased when they changed back to Purina and he did not know anything other than the change back to Purina which increased the productivity; he first noticed the change in the feed approximately six or eight months after they started using it.

It appears the cross action of appellants for damages was predicated on the theory of fraud. The trial court concluded the evidence did not support relief on that ground. Appellants do not complain of that ruling. They argued below, and contend here, the allegations of the cross petition were sufficient to state a cause of action on the theory of warranty. The trial court sustained a demurrer to the evidence on that theory. The court did so on the grounds (1) the feed was not a special kind of feed manufactured for appellants but was a general feed sold under the title of "Sun Gold" with a formula of contents attached to each sack of feed; and (2) the statements of Halstead, the sales agent, construed in the light most favorable to the purchaser, were expressions of the agent's opinion concerning the value of the feed as compared with Purina and did not constitute a warranty.

Counsel for appellants, with commendable frankness, state they are not relying on implied warranty but only on express warranty. They base the contention on the representation of the sales agent that "Sun Gold" was cheaper than Purina and that appellee guaranteed the feed to give as good, or better, results than Purina. It is agreed "Sun Gold" was cheaper than Purina.

On the other hand appellee asserts: (1) The trial court correctly held the statements of the salesman were expressions of his own opinion and not a warranty; (2) Mrs. Triplett, according to the uncontradicted testimony, was the person who made the decision to try the change to "Sun Gold." The evidence failed to show Mrs. Triplett relied on the statements of the salesman; (3) if she relied on such statements her reliance was entirely unreasonable; (4) if the statements constituted a warranty appellants failed to show its breach; (5) by appellants' long continued use of the feed after they claimed to have knowledge of the breach of warranty they waived any right they might have had to recoved damages which accrued either before or after they learned of the alleged breach.

Assuming for the moment, without deciding, a warranty existed, we have no hesitancy in concluding damages were not recoverable for the long period the feed was used after appellants claimed to have knowledge the alleged warranty was breached. (*Swift & Co v. Redhead,* 147 Ia. 94, 122 N. W. 140.) Under the undisputed evidence Mrs. Triplett was the person who determined what feed appellants would buy. She testified: They started using the feed in the fall of 1944; they had very good results for a period of four to six months; she first noticed the change in the feed in the spring or summer of 1945; she first talked to Mr. Bailey about the change after the spring of 1945; she complained about the feed at different times; *the extent of the statements made to her* when she complained was that appellee *expected* to improve the feed, *expected* to increase its quality. (Our emphasis.)

These latter statements did not constitute a warranty of present quality. Touching her reasons for continuing to use the feed until February, 1947, she stated:

"Well, after we had a bill with the feed company we didn't like to quit their feed as long as we owed them, and then they told us, of course, that the feed would be better and we could go ahead, so we just strung along with them thinking they would hit on something that would bring our flock back up."

Thereafter Mrs. Triplett clearly was not relying on a past warranty, if any had been made previously. ' She decided to take her chances with appellee "thinking they would hit on something" to bring her flock back up. A seller should not be held for damages flowing from the purchaser's experiments at his own risk after he has become fully aware of a breach of warranty. (*Swift & Co. v. Redhead,* supra, p. 104-105.)

Although there may be merit in appellee's contention appellants also waived any right they might have had to recover damages which accrued prior to their alleged discovery of the breach of warranty we prefer to go directly to some of the more fundamental questions.

What is a warranty? In 55 C. J., Sales, § 667, it is defined thus:

"A warranty is a statement or representation made by the seller of goods, contemporaneously with and as a part of the contract of sale, although collateral to the express object of it, having reference to the character, quality, or title of the goods, and by which he promises or undertakes to insure *that certain facts are or shall be as he then represents them.* A warranty is express when the seller makes an affirmation with respect to the article to be sold, pending the treaty of sale, upon which it is intended that the buyer shall rely in making the purchase. A warranty is implied when the law derives it by implication or inference from the nature of the transaction, or the relative situation or circumstances of the parties." (p. 652, 653.) (Our italics.)

As previously stated appellants rely entirely on the theory of express warranty. An express warranty excludes an implied warranty relating to the same subject. (*Thresher Co. v. Nelson,* 105 Kan. 517, 184 Pac. 982; *Lumber Co. v. Kelley,* 117 Kan. 285, 231 Pac. 71.) The foregoing definition of express warranty is in harmony with our own decisions. (*Lumber Co. v. Kelley,* supra.) No technical or particular words need be used to constitute an express warranty, yet whatever words are used must substantially mean the seller promises or undertakes to insure that certain facts are, or shall be, as he represents them. (55 C. J., Sales, § 667, p. 652; 46 Am. Jur., Sales, § 313.)

Representations of fact as, for example, that a certain quantity of corn existed in a field (*Abmeyer v. Bank,* 76 Kan. 877, 92 Pac. 1109) or that particular acreage is occupied by a railway right of way (*Disney v. Lang,* 90 Kan. 309, 133 Pac. 572) or that various particular facts capable of exact determination exist are not mere expressions of opinion but warranties. (*Murray v. Davies,* 77 Kan. 767, 94 Pac. 283; *Foote v. Wilson,* 104 Kan. 191, 178 Pac. 430.)

However, a representation that a business in which plaintiffs were

induced to buy stock was one of the best businesses in the city of Topeka was held, as a matter of law, to be an expression of opinion upon which people would naturally differ and hence would not sustain a general verdict. (*Stock v. Scott,* 132 Kan. 300, 295 Pac. 638.) So, too, statements as to the value of real estate by agents endeavoring to sell or exchange the same are ordinarily regarded as expressions of opinion and not representations of fact. (*Else v. Freeman,* 72 Kan. 666, 83 Pac. 409; *Berridge v. O'Flanagan,* 122 Kan. 74, 251 Pac. 175.)

Touching matters of opinion or belief the rule is stated thus in 55 C. J., Sales, § 690:

"In order for an express warranty to exist, there must be something positive and unequivocal concerning the thing sold, which the vendee relies upon, and which is understood by the parties, as an absolute assertion concerning the thing sold, and not the mere expression of an opinion; representations which merely express the vendor's opinion, belief, judgment, or estimate do not constitute a warranty. [p. 688, 689.]

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Dealer's talk is permissible; and puffing, or praise of the goods by the seller, is no warranty, such representations falling within the maxim *simplex commendatio non obligat*." (p. 690, 691.)

To the same effect is 46 Am. Jur., Sales, § 326. See, also, later cases cited in footnotes.

The reason underlying the rule pertaining to dealer's talk which limits a warranty to representations of facts rather than mere statements of opinion as to the nature or quality of goods sold is that there is nothing on which people are more apt to differ and nothing on which they are less apt to trust each other. (46 Am. Jur., Sales, § 326.) Where, however, opinions are coupled with representations of fact which relate to such matters as are susceptible of exact knowledge they constitute more than a mere opinion and hence are properly regarded as representations of fact. To the extent they are representations of fact they constitute warranties. (*Stock v. Scott,* supra, p. 305; *Gray v. Gurney Seed & Nursery Co.,* 57 S. D. 280, 231 N. W. 940.)

The line which separates a case of mere puffing and commendation from an affirmation of a fact is sometimes indefinite. It is in such cases that a perplexing problem arises as to the meaning or intention of the seller. In such cases it is ordinarily the province of the jury to determine as a matter of fact whether a warranty was intended. (46 Am. Jur., Sales, § 326.) Ordinarily whether an affirmation or representation constitutes a warranty is a question of the in-

tention of the seller and the reliance placed thereon by the buyer. (46 Am. Jur., Sales, § 326, p. 507; 55 C. J., Sales, § 684, p. 680.) In order to constitute a warranty the buyer, of course, must be justified in relying on the statement as a statement of fact as distinguished from an opinion of the seller. (55 C. J., Sales, § 692, p. 695.)

In the instant case we are not concerned with an affirmation of any particular fact concerning the chicken feed but only with a general statement of the comparative value of two products. Although the decisions are not in complete harmony relative to the comparative value of an article sold the apparent weight of authority is that such statements, absent all representations as to the particular facts, ordinarily constitute an expression of opinion rather than an express warranty. Some of the cases pertaining to various articles or products are *Carver-Shadbolt Co. v. Loch,* 87 Wash. 453, 151 Pac. 787; *Steen v. Southern California Supply Co.,* 74 Cal. App. 265, 239 Pac. 1098; *Mantle Lamp Company v. Rucker,* 202 Ky. 777, 261 S. W. 263; *Callaway & Perkins v. Collier,* 246 S. W. 966, *Gray v. Gurney Seed & Nursery Co.,* supra; *Washburn-Crosby Co. v. Kindervatter,* 131 N. Y. S. 871.

This rule also appears to be in harmony with decisions of courts in states which have adopted the uniform sales act. (*Gray v. Gurney Seed & Nursery Co.,* supra; 46 Am. Jur., Sales, § 326; 55 C. J., Sales, § 690, p. 694, § 684, 680.)

Appellants rely on *Foote v. Wilson,* supra; *Swift & Co. v. Redhead,* 147 Ia. 94, 122 N. W. 140; *Western S. B. Co. v. O'Brien Bros.,* 49 Cal. App. 707, 194 Pac. 72; *Kent v. Halliday Brothers,* 23 R. I. 182, 49 A. 700.

The Foote case is a striking example of a dealer's "deceitful representation" of facts as distinguished from a mere expression of opinion respecting the merchantable character and the amount at which a stock of merchandise would invoice. We have no inclination to retract any criticism therein contained concerning positive, deceitful representation of actual facts where relied upon by a purchaser to his damage. What is there said, however, cannot properly be construed as meaning that every statement of mere opinion by a seller, absent all representations of fact, constitutes an express warranty. This clearly appears in both our earlier and later decisions involving the subject of warranty in which declarations of fact and expressions of opinion are distinguished. A few of them are *Else v. Freeman,* supra; *Parker v. Hutchinson Motor Car Co.,* 127 Kan. 765, 274 Pac. 1115; *Stock v. Scott,* supra. A requirement of honest deal-

ing between a seller and purchaser is in keeping with modern tendency and this court is committed to that doctrine. Its proper application must be governed by the facts of each particular case. The Foote case clearly does not control the instant case.

The Swift & Co. case, *supra,* was based on representations blood meal would fatten cattle much quicker than cottonseed meal; the former contained eighty-seven percent protein and the latter only thirty-seven percent; on that basis blood meal would be cheaper when used with corn. In that case the court said under the evidence the jury might have found blood meal was not suitable for fattening cattle and was in fact injurious and worthless for that purpose. The court did not hold the representations alone were sufficient to take the case to the jury on the question of warranty. It did hold such evidence was sufficient to make the matter of warranty a jury question when to that evidence was added the circumstance that the seller's agent was aware the purchaser was without experience in the use of blood meal and that the purchaser was relying on the representations made concerning it. (p. 100.)

The Western S. B. Co. case, *supra,* was not a comparison warranty case. It involved an express and unqualified assumption that vetch seed when treated with a certain bacterial preparation of the seller, planted and cultivated according to the seller's directions, upon the buyer's premises would germinate and grow. The purchaser relied on the warranty. The seed failed to measure up to the warranty and the purchaser recovered for the breach. Nor was the Kent case, *supra,* a comparison warranty. It involved only the sufficiency of a declaration to state a cause of action for damages for breach of warranty and was held sufficient against demurrer.

Syllabus paragraph 1 reads:

"A declaration alleged that plaintiff had a crop of growing potatoes; that he purchased of defendants Paris green, which they warranted to be pure and that it would kill the potato-bugs on plaintiff's crop of potatoes; that he applied said Paris green in a reasonable and proper manner, but that it was impure and of insufficient strength and did not kill the bugs, and that defendants knew at time of sale for what purpose plaintiff intended to use the article."

Notwithstanding the apparent weight of authority with respect to expressions of opinion concerning the comparative value of different articles or products we are not inclined to say as a matter of law, that such an opinion could under no circumstances be regarded as a warranty even if so intended by the seller and relied upon by the buyer. Whether it was so intended and relied upon may well

become a question of intention to be determined by the jury depending on the peculiar facts and circumstances of the particular transaction.

In the instant case, however, the decision to purchase "Sun Gold" was not made by Mr. Triplett, or the son, but by Mrs. Triplett alone. Although it may not be entirely accurate to refer to her as an expert she concededly was a person with twelve years' experience in a highly technical and productive poultry business. To each bag of "Sun Gold" feed purchased was attached a tag containing a content analysis of the feed. When the yeast enzyme was added the tag disclosed it. We do not find any evidence to show appellants were defrauded by anything the tag disclosed or failed to disclose and fraud, although originally charged, is no longer claimed. Appellee's sales agent first talked to Mrs. Triplett in June, 1944. She did not purchase the feed at the time of the alleged original warranty but finally decided "to try" the change to the cheaper "Sun Gold" feed in August, or the fall, of 1944. It was her own decision to experiment on the change of feed. Nor did she ever say she bought "Sun Gold" in reliance on the alleged warranty. What reliance her husband or son claimed to have placed on the alleged warranty is not determinative of that issue in this case. Her own decision to use the feed is further disclosed by the fact that even after she discovered in 1945 the feed was not satisfactory to her she continued to experiment with it until February, 1947, in the hope appellee would find something to improve it. Absent the establishment of her reliance upon the alleged warranty no actionable warranty existed.

In view of the foregoing we need not decide whether appellants' evidence established a breach of an express warranty. It is noteworthy, however, that appellants' evidence showed appellee believed "Sun Gold" was a balanced feed and warned appellants against using it with buttermilk for the stated reason it would throw the feed out of balance. Notwithstanding such warnings appellants persisted in continuing to use the feed with buttermilk. That, too, was their own decision and it violated appellee's directions for the use of the feed. This fact alone tended to negative a breach of the alleged warranty. Aside from any question of breach of warranty this circumstance is further evidence Mrs. Triplett did not rely upon the alleged warranty but, on the contrary, relied upon her own judgment in determining what feed she believed to be best suited for the chickens.

We think appellants' evidence failed to establish an express warranty and that such a warranty, if made, was relied upon by Mrs. Triplett.

The order sustaining the demurrer is affirmed.