No. 47,138

Young & Cooper, Inc., A Corporation, *Appellee,* v. Robert B. Vestring & James W. Vestring d/b/a Vestring Brothers, A Partnership, *Appellants.*

(521 P. 2d 281)

Opinion filed April 6, 1974.

*John P. Woolf,* of Martin, Pringle, Schell & Fair, of Wichita, argued the cause, and was on the brief for the appellants.

*Robert C. Foulston,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *John E. Foulston,* of the same firm was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action to recover the balance due on the sale of cattle under an oral sales contract. The action was defended on the theory that nothing was due the plaintiff because

it failed to deliver a breeding herd of cattle in compliance with the oral sales contract, and the defendants counterclaimed for damages resulting from the plaintiff's breach of express and implied warranties made in the course of the transactions for the purchase of the cattle.

The case was tried to a jury which returned a verdict in favor of the plaintiff for the balance due on the oral sales contract. The trial court withdrew from the jury the issue as to whether express warranties were made and breached by the plaintiff. Appeal has been duly perfected by the defendants.

The primary issue on appeal is whether the trial court erred in withdrawing from the consideration of the jury the defendants' claim that the plaintiff made express warranties concerning the cattle sold to them, which were false.

The plaintiff in this action is Young & Cooper, Inc. (appellee). Don Young was acting on its behalf throughout the transaction in question. Robert B. Vestring and James W. Vestring d/b/a Vestring Brothers, a partnership, are defendants-appellants. Robert B. Vestring conducted negotiations on their behalf.

In March of 1969, while attending a cattlemen's convention Robert Vestring first learned Young & Cooper, Inc., had recently acquired a herd of cows. He was encouraged by Don Young to take a look at them when they arrived in Kansas. According to Don Young's testimony the appellee corporation purchased the herd, consisting of 450 Black Angus cows, five Hereford bulls and two Angus bulls, on January 21, 1969, from Leslie Nix who resided in Arkansas. Young had previously been acquainted with Nix and said he had purchased the prior year's calf crop from him. While Nix sold the herd to the appellee in late January, arrangements were made to leave them in Arkansas until early April when the appellee would have the cattle transported to Kansas. In order to comply with certain regulations controlling the transportation of livestock across the Kansas state line, Don Young contacted Dr. John G. Gish, a veterinarian practicing in El Dorado. Young requested Dr. Gish's assistance in obtaining the proper permits for the entrance of the cattle into Kansas with the least possible inconvenience as to handling the cattle and conducting tests. Dr. Gish contacted the state regulatory officials and ascertained that a stable, or one brand herd, *i. e.*, an established herd that has been held under one ownership for a con-

siderable period of time without constant additions, could be allowed entrance into the state, provided they came from a modified-certified brucellosis free area. Dr. Gish relayed this information to Nix's veterinarian in Arkansas.

Arrangements for moving the cattle were soon completed, and in the first week of April 1969, the cattle were trucked from Arkansas to Kansas by the appellee in its own trucks. The Arkansas health certificates accompanying the cattle indicated they were from a modified-certified brucellosis free area and bore the signature of a veterinarian, Dr. R. W. Phillips. The appellee corporation leased a tract of land, referred to as the Dunne pasture, located near Rosalia, Kansas, and placed the herd on it. The Dunne pasture is actually composed of three pastures, one located north of U. S. 54, one about the same size located on the south side of U. S. 54, and a much smaller pasture located just east of the south pasture.

Both Mr. Young and Mr. Cooper admit they told Robert Vestring that the cows were all brought directly to the Dunne pasture with no additions or deletions. However, the Vestring Brothers purchased 445 cows and fifteen bulls. Dr. Phillips in Arkansas signed documents indicating that a total of 465 cows and thirteen bulls were loaded in Arkansas. Thus, indicating a loss of twenty cows and an addition of two bulls. Mr. Young in his testimony was unable to account for these differences. Leslie Nix testified that he sold 450 Black Angus cows with calves and seven bulls, five Herefords and two Angus, to Young & Cooper. Mr. Young testified he purchased some bulls at the stockyards in Wichita and after having them tested for T. B., Bangs and also for sterility put them with the herd.

On the Sunday after the cattle arrived, Don Young inspected them. Later that afternoon Robert Vestring also inspected them and contacted Don Young indicating he would discuss the prospects of purchasing them with his partner, James W. Vestring.

The following Monday or Tuesday Robert Vestring went to Don Young's office to discuss buying the herd. The two men's testimony regarding these negotiations varies somewhat. According to Don Young's testimony the men began the negotiations by discussing the price. Vestring thought Young was asking too much money for the cows. Young testified that during the negotiations he told Vestring the age of the cows was from three to five years; Young

& Cooper, Inc., had purchased them as a breeding herd; that Nix had purchased the cows from some place in Texas and this was their second crop of calves; he described the herd as *a good reputable herd;* Nix had had the cows pregnancy tested around the first of the year to see if they were all pregnant; they had not been blood tested for brucellosis; he did not specifically recall describing them as "clean" cows but conceded that he could have.

Robert Vestring's testimony was that Young stated during the negotiations: That the cows were a choice quality Angus breeding herd; it was their second calf crop; they were *all one brand of cattle* (which was explained by Dr. Gish to mean *a stable herd or an established herd that has been held under one ownership for a considerable period of time without constant additions*); they originated from San Angelo, Texas, (which according to the appellants indicated good quality cattle); that Young guaranteed the pregnancy test on the cows and, with the exception of 50 cows which would have calves in the winter, the rest either had calves at the time of the negotiations or would have calves by the end of the summer; and the cows had come from a modified-certified brucellosis free area in Arkansas, which means the area had a relatively low incidence of brucellosis. Vestring further testified that Young told him the cattle had not been blood tested for brucellosis, and that he was aware the only certain method for determining whether cows are infected with brucellosis is by a blood test.

The parties stipulated that after the foregoing negotiations were completed, Robert Vestring, on behalf of the appellants, orally agreed to purchase 450 cows and fifteen bulls to be used for breeding purposes from appellee for $127,000, and to sublease the Dunne pastures for $15,000. The parties also stipulated the appellants have paid appellees the $15,000 required under the subleasing agreement and $110,000 under the sale agreement, leaving an unpaid balance of $17,110.

After the appellants took control of the cattle, H. A. "Cap" Vestring, a cousin, employed by appellants as a ranch manager was made responsible for looking after them. He checked them at least once a week and sometimes twice.

On or about August 20, 1969, while inspecting the cattle H. A. Vestring found a cow in the north Dunne pasture which appeared to have aborted a calf. After penning the cow, H. A. called Dr.

Gish to examine the cow. The doctor obtained blood samples from the cow and sent them to the state laboratory in Topeka, Kansas. The blood test disclosed a positive reaction to brucellosis. As a result the herd in the north pasture was immediately quarantined.

In describing the disease of brucellosis the doctor stated it has the ultimate effect of damaging a cow's reproductive organs and causing an abortion after reaching certain proportions. There is no known cure for brucellosis, and if a herd of breeding cows become infected they are no longer of any use for breeding.

Along with Frederick M. Gengler, a federal livestock inspector, Dr. Gish tested the 202 cows in the north Dunne pasture. The initial test disclosed 81 reactors, approximately 40% of the number tested.

Dr. Gish, and Dr. Neal Conley, a veterinarian with the United States Department of Agriculture Animal Health Service as the Kansas Brucellosis Epidemiologist, tested all cattle in the south Dunne pasture. Out of 238 cattle tested 95 reacted positively to brucellosis, which is also approximately 40%.

Dr. Gish characterized the incidence of brucellosis reactors as a "heavy incidence of this disease," and stated that this incidence indicated to him that the cows had been infected for one to two years. The doctor further stated:

"The fact that the cows in each pasture when first tested had the same percentage of reactors leads me to the opinion that they had the same exposure to the disease prior to when they were separated."

His opinion that the herd was infected before it arrived in Kansas was based upon his experience that 40% of a herd could not become infected by transmitting it among themselves for only a period of six months (the length of time the cattle had been in Kansas when the disease was discovered).

Dr. Conley, who participated in testing the cattle in the south pasture, testified that as a result of his investigation of the case, based upon his educational background, he believed the source of the brucellosis was outside of Kansas. He stated that a high percentage infection is a long term infection rather than a short term exposure of a large percentage of the cattle, particularly in this case because the animals were separated into three areas. While taking blood samples the doctor noticed that *43 of the cows had Louisiana ear tags.* His investigation of these cows' history

disclosed they were more or less *transient heifers in Louisiana* but found no record of any previous exposure to brucellosis infection.

Both Drs. Gish and Conley agreed with the following statements, "Under certain circumstances the organisms will live for weeks outside the body" and "Mechanical vectors such as dogs, other animals, and man can act as a means of spreading infection." However, neither was inclined to agree that it was possible the brucellosis germ might have remained alive in cow manure and have been spread from pasture to pasture by the cowboys or pickup trucks.

Dr. Gish's office participated in all blood tests performed on the cattle. There were nineteen brucellosis tests performed, which disclosed a total of 249 reactors out of 440 tested.

At the time he initially tested the cows in the north pasture, Dr. Gish conducted pregnancy tests on each cow and also tested to determine which ones were still nursing calves. His examinations revealed "40-some animals" out of the 202 tested "either didn't have one [a calf] or she lost it or it was premature or it died for some reason or another during the summer of '69."

Subsequent to the initial performance of the brucellosis test on the south pasture, Robert Vestring went to see Don Young. Vestring wanted the money back and offered in return to look after the cattle for the rest of the summer. Young replied that he did not want any infected cows but that he was willing to knock $5,000 off of the sale price.

H. A. "Cap" Vestring, the appellants' ranch manager in charge of the cows, testified that 293 calves were weaned off of the herd in 1969, plus an additional 15 calves moved into pens soon after birth following the first of the year in 1970, rather than leaving the calves with the cows. He further stated that a cow's gestation period is nine months so that if the cows were pregnant in April (when they arrived in Kansas) they should have given birth to calves before the end of the year.

James Vestring testified as to the damages they sustained as a result of the brucellosis infection. They had to sell all 249 of the infected cows as slaughter cows. In subtracting the amount received from the sale of the reactors, plus $25 per head indemnity they received from the federal government, from the $273 per head they paid appellee, their total loss was $21,190.71. There were additional costs such as conducting the blood tests; hiring

additional men; renting another pasture; and also computing for 90 additional calves which the Vestrings believe they should have had, if the herd had been "normal". Their total losses claimed for buying a breeding herd diseased with brucellosis were $43,292.26.

The Vestrings in their counterclaim alleged that the cows sold to them by the plaintiff were infected with brucellosis, and that such sale was in violation of both expressed and implied warranties by the plaintiff to them that the cows were fit for the purpose for which they were sold.

The plaintiff in reply denied that any warranties expressed or implied were made to the defendants.

In the pre-trial order the trial court recited the defendant's contention that the plaintiff "has breached express and implied warranties made by the plaintiff to the defendants during the transactions for the purchase of these breeding cattle." In the pre-trial order the claims of the plaintiff were set up as follows:

\* \* \* \* \*

"(a) Defendants owe plaintiff on open account.

"(b) Plaintiff made no warranties, either expressed or implied, to the defendants.

"(c) Even if warranties were made, the defendants carried out an inspection of the cattle prior to the sale.

"(d) If warranties were made, plaintiff delivered the cattle in compliance with the warranties.

"(e) If, in fact, the cattle had brucellosis, it was contracted after the sale to defendants."

The pre-trial order also set up the defendants' claim as follows:

\* \* \* \* \*

"(a) Plaintiff failed to deliver cattle which complied with the oral sales contract.

"(b) Plaintiff breached an express warranty made to defendants.

"(c) Plaintiff breached an implied warranty of merchantability made to defendants.

"(d) Plaintiff breached an implied warranty of fitness for a particular purpose made to the defendants."

The trial court in its instruction to the jury regarding warranties limited the issue to an implied warranty of fitness for the cows purchased by the defendants. After instructing on the measure of damages for breach of an implied warranty the trial court instructed:

\* \* \* \* \*

"No. 6

"When a seller at the time of contracting for a sale has reason to know of

any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose.

"A seller who breaches this warranty is liable to the buyer of such goods who sustains injury as a result.

"You are further instructed that a buyer has a duty to use ordinary care for his own protection. He must exercise such care with reference to those defects about which he knows or understands or which he should know or understand. If a buyer does not use ordinary care for his own protection, he must be deemed to have waived his right to rely upon said defect in a claim for breach of warranty."

Instructions pertaining to express warranties requested by the defendants were refused by the trial court. They read:

"Instruction No. 8

"In the sale of goods, express warranties by a seller are created as follows:

"(a) Any affirmation of fact or promise which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods will conform to the affirmation or promise.

"(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods will conform to the description.

"An affirmation merely of value or a statement purporting to be the seller's opinion or commendation does not create a warranty.

"It is not necessary that formal words of warranty be used to create the warranty or that the seller have specific intention to make a warranty.

"A seller who breaches an expresss warranty is liable to the buyer of the article who sustains injury as a result. PIK 13.15 (modified)

"Instruction No. 9

"An implied warranty can be excluded or modified when the buyer, before entering into the contract, has examined the goods as fully as he desires or has refused to examine the goods. There is no implied warranty with regard to defects which an examination ought, in the circumstances, to have revealed to him.

"However, such an examination by the buyer or a refusal to examine the goods by the buyer will not exclude or modify an express warranty. K. S. A. 84-2-316 (3) (b), K. S. A. 84-2-313 Case Comment."

In denying the defendants' request for the express warranty instructions the trial court said:

". . . Well, insofar as the theory of express warranty is concerned, this is a case where the parties are ninety-nine and nine-tenths percent in agreement as to exactly what happened insofar as this sale is concerned. They both had been in the cattle business for years, they're familiar with the trade, and all are familiar with the disease of Bang's, brucellosis. At the time of the sale and prior thereto, inquiry was not that they—or the statement by the seller was not that they did not have brucellosis, but they did come from a clean herd and that they had not been blood tested. The evidence certainly bears out that everyone familiar with the cattle industry knows that there is no way

for anyone to say that a cow does or does not have brucellosis without a blood test, and with that knowledge and with that skill on the part of everyone involved in this litigation, there is no basis upon which ground of express warranty lies. . . ."

In this posture the case was submitted to the jury which returned a verdict for the plaintiff in the amount of $17,110 plus interest, and against the defendants on their counterclaim.

It is the position of the appellee that this is a fact case and the general verdict is supported by competent evidence and should be affirmed. It is argued the case was presented to the jury on the issue of whether the cattle in question had brucellosis at the time of the sale; that such issue was fully tried to the jury and the jury, by its general verdict, found the cattle in question did not have brucellosis at the time of sale; and that the appellants simply lost a fact question and are now attempting to restructure their theories on appeal. It is argued a finding for the appellee includes a finding that the cows were fit as a breeding herd and/or that the appellants have failed to sustain their burden of proof that they were not fit for breeding purposes. Such findings, it is said, are in the nature of negative findings. The appellee relies on the rule that findings of a negative character will not be set aside on appellate review, since adequate opportunity for weighing evidence and determining credibility of witnesses is lacking. (*American Housing & Investment Co. v. Stanley Furniture Co.*, 202 Kan. 344, 449 P. 2d 561.)

The appellee attacks the points asserted by the appellants on the ground that for the first time on appeal they set forth new theories in support of their claim of breach of express warranties. We fail to see merit in the foregoing argument.

Whether express warranties were made by the appellee in this case was first raised as an issue by the pleadings in the case. It was later stated to be an issue in the pre-trial order. Furthermore, the trial court permitted all of the appellants' evidence concerning express warranties to go before the jury. It was only when the instructions were given to the jury that the trial court withdrew the issue of express warranties from the jury.

The Uniform Commercial Code defines what creates an express warranty by the seller. K. S. A. 84-2-313 (1) (*a*) states:

"Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis for the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

The foregoing section of the Uniform Commercial Code does not change the prior law established in Kansas.

In *Adrian v. Elmer*, 178 Kan. 242, 284 P. 2d 599, the plaintiff was attempting to recover the purchase price of a registered Hereford bull and damages resulting from an alleged breach of an express warranty. The plaintiff purchased the bull for the purpose of covering registered cows and getting calves from them. The plaintiff claimed that the defendant, through his agent, represented and warranted to the plaintiff that the bull was a sound, healthy bull, perfect in all parts, and that he was a one-hundred percent breeder —a sure calf getter. The defendant admitted the sale, but contended that neither he nor his agent expressly warranted the bull to be a good breeder and that his statements were mere expressions of opinion. In upholding the trial court's determination that an express warranty had been breached, it was held that when the seller makes an affirmation with respect to the article to be sold pending the agreement of the sale, upon which it is intended that the buyer shall rely in making the purchase, an express warranty is created. The court held that no technical or particular words need be used to constitute an express warranty, and that representations as to the quality or fitness of an animal for breeding purposes ordinarily constitute an express warranty of such. The court further held if the facts or affirmations relied upon to prove an express warranty rest wholly in parol, it was the province of the jury to determine whether they amounted to an express warranty.

K. S. A. 84-2-313 (2) states:

"It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

This subsection is also in accord with the case law in Kansas established prior to the code. (*Adrian v. Elmer*, supra; and *Topeka Mill & Elevator Co. v. Triplett*, 168 Kan. 428, 213 P. 2d 964.)

The question of express warranties with respect to a breeding herd of cattle was presented in *Naaf v. Griffitts*, 201 Kan. 64, 439 P. 2d 83. There the plaintiff sought to recover damages he alleged resulted from breach of an express warranty in the sale to him of 59 heifers by the defendant. The defendant, an experienced cattleman, had run an ad in the newspaper offering for sale choice Here-

fords to calve in September and October. In response to the ad, the plaintiff contacted the defendant and inspected the heifers. In the ensuing discussion the defendant was made aware of the fact that plaintiff was interested in heifers that would calve in September or October, 1965. The plaintiff, relying upon the ad and the defendant's oral statements, bought the 59 heifers on August 17th. The evidence at the trial was that the heifers, in fact, had not been pregnancy tested. Only ten of them calved during September and October, and two were born in December. Eventually 38 calved by the defendant's bulls. The trial court, rendering a judgment in favor of the plaintiff, found:

" 'The seller's statements of fact that the heifers had been pregnancy tested coupled with his advertisement and his statements that they would calf in September or October (1965) was a statement of fact that they were pregnant. These statements also amounted to a warranty that the heifers were seven or eight months pregnant. . . .' " (pp. 65, 66.)

In affirming the trial court's decision it was said that under the circumstances, these representations were more than mere expressions of opinion upon which the seller intended the buyer to rely. Therefore, in accordance with the rule stated in *Adrian v. Elmer*, supra, the trial court, as the fact finder, was justified from the evidence in concluding that the defendant expressly warranted the heifers were seven or eight months pregnant.

In *Topeka Mill & Elevator Co. v. Triplett*, supra, the court distinguished between statements of fact and opinions. The court held that representations of fact capable of determination are warranties, but mere expressions of opinion, belief, judgment or estimate by a dealer in sales talk are not. Where opinions are coupled with representations of fact which relate to such matters and are susceptible of exact knowledge, they constitute more than a mere opinion and are properly regarded as representations of fact, and, to the extent they are representations of fact, they constitute warranties.

The first paragraph of Instruction No. 6 given to the jury is in accordance with the definition of an implied warranty under K. S. A. 84-2-315.

Under exclusion or modification of warranties K. S. A. 84-2-316 (3) (*b*) provides:

"(*b*) [W]hen the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine

the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; . . ."

As to *implied warranties* the foregoing indicates that an examination by the buyer carries the implication of assumption by the buyer of the risk of defects which his examination ought to reveal. (K. S. A. 84-2-316, Kansas Comment.)

Examination as used in paragraph (*b*) of subsection (3) above is not synonymous with inspection before acceptance or at any other time after the contract has been made. It does indicate that an implied warranty may be excluded or modified by the circumstances where the buyer examines the goods before entering into the contract. If the buyer unreasonably fails to examine the goods before he uses them, resulting injuries may be found to result from his own action rather than proximately from a breach of warranty. But to bring the transaction within the scope of "refused to examine" in paragraph (*b*) of subsection (3) it is not sufficient that the goods are available for inspection. There must in addition be a demand by the seller that the buyer examine the goods fully. The seller by the demand thereby puts the buyer on notice that he is assuming the risk of defects which the examination ought to reveal. (K. S. A. 84-2-316, Official U. C. C. Comment, ¶ 8.)

Further Official U. C. C. Comment following 84-2-316, *supra,* ¶ 8, indicates the foregoing section rejects application of the doctrine of *"caveat emptor"* in all cases where the buyer examines the goods *regardless of statements made by the seller.* Thus, if the offer of examination is accompanied by words as to their specific attributes for the purpose for which the buyer is seeking the goods, and the buyer indicates clearly that he is relying on those words rather than on his examination, *they give rise to an "express" warranty.*

The particular buyer's skill and normal method of examining goods in the circumstances determine what defects are excluded by the examination. A failure to notice defects which are obvious cannot excuse the buyer. However, an examination under circumstances which do not permit chemical or other testing of the goods would not exclude defects which could be ascertained only by such testing. Nor can latent defects be excluded by simple examination. (84-2-316, *supra,* Official U. C. C. Comment, ¶ 8.)

K. S. A. 84-2-313 (1) (*b*) provides:

"Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."

An express warranty by definition in 84-2-313 (1) (a), *supra*, makes it contractual and particular reliance upon the express warranty need not be shown. The Kansas comment to the foregoing section of the code says the definition is simplified by elimination of the element of reliance. (See, *Topeka Mill & Elevator Co. v. Triplett,* supra.)

Official U. C. C. Comment under the foregoing section of the act indicates that in actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.

Express warranties are not subject to exclusion or modification in the same manner as implied warranties. (84-2-313, *supra,* Kansas Comment.) Further authority for this proposition is found in K. S. A. 84-2-316 on exclusion or modification of warranties, which speaks only in terms of implied warranties as being subject to exclusion or modification.

The cumulation and conflict of warranties express or implied is covered in K. S. A. 84-2-317. It provides:

"Warranties whether express or implied shall be construed as consistent with each other and as cumulative, but if such construction is unreasonable the intention of the parties shall determine which warranty is dominant. In ascertaining that intention the following rules apply:

"(a) Exact or technical specifications displace an inconsistent sample or model or general language of description.

"(b) A sample from an existing bulk displaces inconsistent general language of description.

"(c) Express warranties displace inconsistent implied warranties other than an implied warranty of fitness for a particular purpose."

Several Kansas cases prior to the code take a position contrary to the code, where they state that an express warranty excludes an implied warranty relating to the same subject. *(Topeka Mill & Elevator Co. v. Triplett,* supra; *Illinois Zinc Co. v. Semple,* 123 Kan. 368, 255 Pac. 78; *Lumber Co. v. Kelley,* 117 Kan. 285, 231 Pac. 71; and *Thresher Co. v. Nelson,* 105 Kan. 517, 184 Pac. 982.)

In *Huebert v. Federal Pacific Electric Co., Inc.,* 208 Kan. 720, 494 P. 2d 1210, decided after the Uniform Commercial Code was enacted and became the law of this state, it was concluded that "contributory negligence and assumption of risk in their normal meaning are not defenses to an action based on the breach of an express warranty." (p. 726.)

Application of the foregoing rules to our analysis of the record presented on appeal leads to the conclusion that the trial court erred in its refusal to give the instructions pertaining to express warranties requested by the appellants, and that such refusal prejudicially affected the substantial rights of the appellants in the trial of the case.

There is evidence in the record from which the jury could have found that the herd of cattle here in question was expressly warranted to be either free or reasonably free of brucellosis. Here the facts or affirmations relied upon by the appellants to prove an express warranty rest wholly in parol, and whether they amount to an express warranty or warranties is a question for the jury to determine.

Evidence upon which the jury could have based a finding that the cattle were expressly warranted either to be free or reasonably free of disease is the following.

Mr. Young admitted that he could have described the cows as "clean" cows. In the cattle business this would mean that the cows were free of disease.

Mr. Young admitted that he represented to the appellants prior to the sale that these cows were purchased by them as a breeding herd; that he described the herd as a "good reputable herd"; and that he knew its history.

Robert Vestring testified that he was told by Mr. Young the cows were a choice quality breeding herd which originated from San Angelo, Texas; that Mr. Young knew the history of the herd because he purchased them from a rancher and sent them to Mr. Nix in Arkansas to be bred; that Mr. Young purchased the first calf crop; that Mr. Young later purchased the cows back from Mr. Nix; and that they were *all one brand of cattle*. This was explained by Dr. Gish to mean a stable herd or an established herd that has been held under one ownership for a considerable period of time without constant additions.

The fact that these cattle were permitted to enter Kansas as a *stable* herd from a modified-certified brucellosis free area further confirms representations made to the appellants that the cows were a *stable*, or *one brand herd*.

Robert Vestring also testified that Mr. Young guaranteed the pregnancy test on these cows. This meant that each cow had been pregnancy tested and was found to be carrying a calf. Mr.

Young told Robert Vestring that all the cows that did not have calves by their side when sold to the Vestrings would have a calf in the summer, except approximately 50 cows that would not have a calf until fall or winter.

There was evidence from which the jury could find that this herd of cows was not as expressly warranted. There was abundant evidence that the herd in question was not a stable, or one brand herd. Forty-three head of animals in this herd tested by the veterinarians were found to have originated in Louisiana, and they were traced to be transient heifers in Louisiana. There was also evidence of fresh brands on these cows in the pasture at the time they were tested, indicating that cows had been recently added to the herd prior to purchase by the Vestrings.

There was also testimony by Mr. Nix that he had calving problems with these cows the previous winter and called a veterinarian in January 1968. He said of the eight cows he had blood tested the test "showed one reactor as brucellosis." Mr. Nix said, "I found out that she was a reactor because she had been vaccinated."

Testimony concerning the discrepancy in the number of the cows loaded in Arkansas and taken directly to the Dunne pasture in Kansas was proper for the jury to consider in connection with express warranties made. The Arkansas veterinarian counted 460 cows loaded in Arkansas—yet only 445 cows were in the Dunne pasture and sold to the Vestring Brothers. Young and Cooper purchased and paid for only seven bulls on their contract with Mr. Nix, yet Mr. Nix shipped thirteen bulls to Kansas and Young and Cooper sold to the Vestrings fifteen bulls.

On cross-examination Mr. Young admitted he told Robert Vestring that he purchased the first calf crop from Mr. Nix in December 1968, but he estimated its size at 100 calves. The jury is entitled to consider that a cow herd of 450 cows should produce more than 100 calves in one season in determining whether these cows were from a stable herd.

Our opinion need not be extended by other evidence in the record concerning affirmations of fact and the reliability of their existence.

There was abundant evidence of the disease of brucellosis in this herd. There was testimony the disease had been in the herd for two years.

There was no evidence that the cows had been pregnancy tested

by the appellees. The only evidence on pregnancy testing was that of Mr. Nix, who said he did pregnancy testing in November 1968.

The trial court concerning the disease of brucellosis limited the issue to one of implied warranty in this case. It simply ruled as a matter of law that where the seller of a breeding herd of cows tells the buyer that the cows have not been blood tested for brucellosis, and the buyer knows the only way to determine for sure whether cows have brucellosis is to blood test the cows, the buyer who fails to blood test such cows before purchase takes them subject to all risk of the disease of brucellosis. In other words, the trial court held the buyer assumes the risk under these circumstances and express warranties cannot override the buyers' acceptance of the herd of cows without such blood testing. In a nut shell the trial court said: "The statement by the seller was not that they did not have brucellosis, but that they did come from a clean herd and that they had not been blood tested." This is contrary to the law regarding express warranties under the Uniform Commercial Code.

Cattlemen know that cows from a stable and reputable herd, which are all of one brand without constant additions to the herd, whose past history is known and has been closely followed by reputable cattlemen, and which are from a modified-certified area (See, K. A. R. 9-2-25) *are reasonably certain to be clean animals.* Cows that meet the foregoing requirements are allowed by the United States Department of Agriculture and the Kansas Department of Agriculture to be shipped into Kansas in interstate commerce without a brucellosis test being required *because they are reasonably certain to be clean animals.* They can be purchased without the necessity of brucellosis tests being conducted.

Oral representations that a herd of cows possesses these qualities are representations of fact which constitute express warranties. Being express warranties they are a part of the contract of sale. There is no modification or exclusion of express warranties.

Contributory negligence and assumption of risk cannot be asserted against the buyers, and the buyers are not obligated to show particular reliance upon the express warranties, since they are contractual. All the buyers are required to establish is that the express warranties were made and that they were false, thereby establishing a breach of the contract.

In the present case Robert Vestring visually examined the cows prior to sale and relying on Mr. Young's affirmation of facts concerning the herd did not have a blood test conducted. It is established by the record that the only positive way to determine whether cows have the disease of brucellosis is by a blood test. Determination of the condition of pregnancy in a herd of cows can only be made after a pregnancy test. Under these circumstances Robert Vestring's visual examination of the herd of cows prior to purchase would not reveal to him whether all cows in the herd were pregnant, or whether the herd was infected with brucellosis. Therefore, even under an implied warranty of fitness for a particular purpose the visual inspection of Robert Vestring would not modify or exclude the implied warranty. The record discloses no demand by Mr. Young that Robert Vestring have the cows blood tested or that he have the cows pregnancy tested.

The judgment of the lower court is reversed with directions to grant the appellants a new trial.