JAMES ENGLAND, APPELLEE, V. ROBERT A. LEITHOFF, APPELLANT.

323 N.W.2d 98

Filed August 13, 1982. No. 44350.

John S. Mingus of Mingus & Mingus, for appellant.

John Wightman of Wightman and Fallesen, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

WHITE, J.

This is an appeal in a law action from the judgment of the District Court for Buffalo County, Nebraska, in favor of the plaintiff-appellee for $1,789.03 and costs of $427.06. The District Court affirmed the judgment of the Buffalo County Court. The errors assigned are essentially that the decision is contrary to the law and is not supported by the evidence.

In considering the errors alleged on appeal, we are mindful of our standard of review: "In a law action tried to the court without a jury, the findings of the court have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong." *McDowell Road Associates v. Barnes,* 198 Neb. 207, 210-11, 252 N.W.2d 151, 153 (1977). " 'It is not within the province of this court in a law action to resolve conflicts in or to weigh evidence. If there is a conflict in the evidence, this court will review the judg-

ment rendered, will presume the controverted facts were decided by the trial court in favor of the successful party, and the findings will not be disturbed unless clearly wrong. . . .' " *Buttner v. Omaha P. P. Dist.*, 193 Neb. 515, 517-18, 227 N.W.2d 862, 864 (1975).

The suit arose out of the purchase by the plaintiff, James England, of eight bred gilts (female pigs). The sale took place on April 21, 1979. The seller of the gilts was the defendant, Robert A. Leithoff. England purchased the gilts in response to an advertisement Leithoff ran in the Grand Island Independent newspaper. England contacted Leithoff and the price was fixed at $1,760 for all eight, or $220 each. England testified that Leithoff informed him "that he had got them from a friend auctioneer of his and I said if these come off of the salebarn or out of the salebarn, I don't want them and upon his answer, they had not come from a salebarn." England testified that if he had known the gilts had been sold at a sale barn, he would not have purchased them. The gilts had, in fact, been purchased by Leithoff at a sale barn in Sargent, Nebraska, on April 13, 1979. The gilts appeared to be healthy on delivery on April 21, 1979, and were placed on clean ground at England's farm. The first gilt delivered on April 24, 1979, within 3 days of the purchase, and all nine pigs were dead at birth. Four more gilts delivered within 24 hours and all pigs were born dead. Eleven pigs were ultimately delivered alive from the eight gilts.

Shortly after the delivery of the first gilt, England contacted Robert Hinke, a livestock equipment dealer from Axtell, Nebraska. Hinke testified that he was born and raised on a farm and had raised hogs practically all his life. Further, he had been a partner with a veterinarian and had worked as a veterinarian's assistant, assisting in diagnosis and treatment of diseases of hogs. Hinke testified that he had attended seminars run by veterinarians from

Iowa State University and Purdue University relating to animal care, and has read extensively on the subject. Hinke drove to the England farm and observed the gilts that had just given birth to the dead pigs. He observed excessive saliva at the mouth and heavy mucous drainage of the vagina, and the piglets were premature, gaunt, and their hair was shorter than normal. Over objection, he was allowed to testify that the gilts were suffering from a swine disease called leptospirosis. Hinke took two of the dead piglets to Dr. Glen Nickelson of the Holdrege Veterinary Clinic. Dr. Nickelson examined the pigs internally and externally, and observed that the lungs were flat, indicating that the pigs were born dead. Hinke related his observations of the gilts. Dr. Nickelson testified that in his opinion the gilts suffered from leptospirosis, a disease that destroys the value of gilts as breeding stock and results in either aborted dead pigs or stunted pigs that fail to gain weight or reach market weight as do pigs born of healthy gilts. He further testified that leptospirosis has an incubation period of from 5 to 21 days, and that the gilts suffered from the disease at the time they were delivered to the England farm.

Hinke further testified that hog producers would not purchase gilts from a sale barn because "Where they run so many hogs through salebarns, it is inevitable that you can . . . that you can take hogs that are well and run them through a salebarn and they will pick up a disease from the manure if nothing else in the pens and the alleys and therefore farmers who buy breeding stock . . . there are very few that I know of that would even take the risk of buying from a salebarn for brood stock in hogs." Hinke further testified that he would never recommend to a customer to buy gilts from a sale barn, and that, in view of the risk, his opinion of the value of a bred sow from a sale barn was that "they would have to pay me to take a bred sow out of a salebarn."

England introduced a regulation of the state Department of Agriculture adopted April 14, 1975, pursuant to Neb. Rev. Stat. §§ 54-1157 to 54-1186, 54-1701 to 54-1711, and 54-2001 to 54-2019 (Reissue 1978), which provides at (3)(c)(i)(E): "Swine released from a market or concentration point shall be confined on the premises of the purchaser for thirty (30) days separate from all other swine . . . ." Although plaintiff urges that a private cause of action is created by the regulation in favor of purchasers from buyers who violate this regulation, in view of our decision here we need not pass on the point, and do not do so. Neb. U.C.C. § 2-313 (Reissue 1980) provides: "(1) Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

In discussing actions on warranties arising under Neb. U.C.C. §§ 2-313, 2-314, and 2-315 (Reissue 1980), White & Summers, Uniform Commercial Code § 9-1 at 326 (2d ed. 1980), observes that a lawyer with a warranty case "First . . . must prove that the defendant made a warranty, express or implied, under 2-313, 2-314, or 2-315. Second, he must prove that the goods did not comply with the warranty, that is, that they were defective at the time of the sale. Third, he must prove that his injury was caused, 'proximately' and in fact, by the defective nature of the goods . . . . Fourth, he must prove his damages."

England brought suit on the theory of breach of an express warranty, and not fraud. The trial court found and the evidence supports the finding that Leithoff warranted that the gilts did not come from a sale barn. However, it is not sufficient that a statement is made in connection with a contract for the sale of goods; the statement, in order to constitute an express warranty, must be "related to the

goods.'' Subsection (1)(b) of § 2-313 provides: ''Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.'' *Larutan Corp. v. Magnolia Homes Manuf. Co.,* 190 Neb. 425, 209 N.W.2d 177 (1973).

Is a representation that farm animals came from a private source and not from a public market related to the goods? We are persuaded by the reasoning of the Kansas Supreme Court in *Young & Cooper, Inc. v. Vestring,* 214 Kan. 311, 521 P.2d 281 (1974). In that case the seller brought suit to recover the purchase price of cattle. The jury returned a verdict for the seller and the buyers appealed, urging that the trial court erred in refusing to instruct the jury on its claim that the seller made express warranties concerning the cattle, which were not true. Among the representations made at trial, according to the testimony of the buyers, were ''That the cows were a choice quality Angus breeding herd; it was their second calf crop; they were *all one brand of cattle* . . . they originated from San Angelo, Texas, (which according to the [buyers] indicated good quality cattle) . . . .'' *Id.* at 315, 521 P.2d at 285. The cattle had a disappointing calving season, and, after testing, a number of them were discovered to have brucellosis. While testing the cows, the veterinarian discovered that 43 of the 450 cows bore Louisiana ear tags. The area in San Angelo, Texas, was shown to be a modified brucellosis-free zone.

In reversing the trial court and remanding for a new trial, the Kansas Supreme Court observed: ''There was evidence from which the jury could find that this herd of cows was not as expressly warranted. There was abundant evidence that the herd in question was not a stable, or one brand herd. Forty-three head of animals in this herd tested by the veterinarians were found to have originated in

Louisiana, and they were traced to be transient heifers in Louisiana. There was also evidence of fresh brands on these cows in the pasture at the time they were tested, indicating that cows had been recently added to the herd prior to purchase by the Vestrings.

. . . .

"Oral representations that a herd of cows possesses these qualities are representations of fact which constitute express warranties." *Id.* at 326-27, 521 P.2d at 292-93.

Although the facts indicate other and more sweeping representations than present in this case, nevertheless, the clear holding of the Kansas Supreme Court is that representations of origin of livestock made in the course of the sale of livestock are express warranties relating to the livestock. "One of the primary tests of whether a given representation is a warranty or a mere expression of opinion is whether the seller assumed to assert a fact of which the buyer was ignorant or whether the seller merely expressed a judgment about a matter as to which each party could be expected to have an opinion." Annot., 94 A.L.R.3d 729, 730 (1979).

" 'It is the general rule of law that a warranty is express when the seller makes an affirmation with respect to the article to be sold, pending the agreement of sale, upon which it is intended that the buyer shall rely in making the purchase.' " *Naaf v. Griffitts,* 201 Kan. 64, 66, 439 P.2d 83, 85 (1968).

Here, both parties testified that Leithoff led England to believe that the gilts were not from a sale barn. England also testified that he would not have purchased the gilts if he knew they came from a sale barn because "I didn't want anything that was bought through a salebarn."

We believe, as did the trial court, that Leithoff led England to believe he was buying gilts that had not come from a sale barn and that this constitutes

an affirmation of fact with respect to the gilts which was part of the basis of the bargain. England relied on Leithoff's representations when he purchased the gilts.

The evidence supports the decision of the trial court. The proximate cause of the damages was adequately shown. Relying on Leithoff's representations, England purchased bred gilts that were suffering from leptospirosis. The incubation period coincides with the time Leithoff purchased the gilts from the sale barn. There was also testimony that the risk of contracting the disease is increased by exposure to a public market.

The defendant does not assign the amount of damages as error. We can find no error in the trial court's decision; therefore we affirm.

AFFIRMED.