No. 28,441.

W. H. MARTIN, as the National Sign Company, *Appellant,* v. THE A. L. SCOTT LUMBER COMPANY, *Appellee.*

(273 Pac. 411.)

Opinion filed January 12, 1929.

*C. A. Smart,* of Lawrence, for the appellant.
*Irwin Snattinger* and *Harry C. Blaker,* both of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by the buyer of lumber to recover from the manufacturing seller damages occasioned by defective performance by the seller. The district court stated findings of fact and conclusions of law, on which judgment was rendered for defendant. Plaintiff appeals.

The findings of fact and conclusions of law follow:

### "FINDINGS OF FACT.

"1. The plaintiff is a resident of Ottawa, Kan., where he has a plant or factory and is engaged in the business of manufacturing and setting up road signs.

"2. The defendant has its principal office in Topeka, Kan., is engaged in the lumber business, and at all times hereinafter mentioned operated a branch lumber yard in Ottawa, Kan., which was in charge of a local manager.

"3. Sometime in December, 1925, the plaintiff ordered from the defendant, through its local manager at Ottawa, a carload of lumber. The lumber in question was to be manufactured into given widths and lengths, and the defendant knew at the time the order was given and received the purpose for which the lumber was to be used, and that exactitude in dimension was essential. In order that the lumber could be used to the best advantage, it was necessary that it should be manufactured with exactness. The order above referred to was for 40,000 pieces, divided into the number and sizes as shown by the first four items on exhibit No. 2. About March 13, 1926, the lumber was delivered at the plaintiff's warehouse and factory in Ottawa, in bundles, tied with twine or wire, and was corded up by him in his factory. He made some examination of the outside pieces on some of the bundles, but did not discover any inaccuracy in the manner in which the lumber was manufactured. So far as the lumber itself is concerned, outside of its manu-

facture, it is admitted to be first class, and the plaintiff makes no complaint in regard thereto. At the time the lumber was delivered the plaintiff appears to have had a fair stock of material on hand proper for the purpose of manufacturing frames similar to the ones which he would make out of the lumber he purchased from the defendant. Some time between April and the latter part of October, 1926, some 4,500 frames were made up from the lumber purchased from the defendant. Some time in late October, 1926, the plaintiff got in touch with the defendant's manager at Ottawa, who went to the plaintiff's factory, where he was advised by the plaintiff that his production in the manufacture of his frames had been considerably slowed down because of the inaccuracies in the manufacture of the lumber delivered to him by the defendant. The defendant's manager listened to the plaintiff's complaint, watched a workman assemble a few of the frames, and advised the plaintiff that he would take the matter of the complaint up with his superiors, with a view to a possible adjustment. No further interview appears to have been had between the parties. After this conversation the plaintiff continued to use lumber which he had bought from the defendant. No adjustment was ever arrived at between the parties, and this action was begun on August 10, 1927. Before the action was begun probably between 6,500 and 7,000 frames had been constructed from the lumber supplied by the defendant. In January, 1928, after this action was begun, plaintiff used the balance of the lumber on hand, and made about 1,000 frames.

"4. A mechanic in the employ of the plaintiff, who appears to have been a reasonably efficient workman, put together from 145 to 165 frames a day from the lumber which was manufactured accurately. The same workman put together only about 90 of the frames with the lumber supplied by the defendant, until a simple contrivance costing about $3 was put into use, and after that the same workman put together about 125 per day. The frames thus made were not all of the exact size desired by the plaintiff, but were reasonably adapted for and used in his business, although many of them were of inferior quality because of inaccuracy in the manufacture of the lumber used. The employee was what might be called an all-round workman, worked at various jobs around the plant, and received $25 per week.

"5. The plaintiff did not receive at any time any direction from the defendant or its manager to proceed to use the lumber in question to best advantage, and there was no promise at any time made to the plaintiff on behalf of the defendant that it would pay for or adjust any damage which might be sustained by the plaintiff.

"6. Knowledge of the inaccuracy in the manufacture of the lumber in question came to the attention of the plaintiff's manager and workman at least two months before any complaint was made to the defendant thereof. While the testimony in regard to the matter is somewhat hazy, it is safe to say that the inaccuracy in manufacture was discovered after comparatively little of the lumber had been used. So far as the testimony shows, the defendant was not hindered or impeded in any way in properly preparing his defense to the plaintiff's claim by reason of the time at which the plaintiff made his complaint of the inaccuracy in the manufacture of the lumber.

"CONCLUSIONS OF LAW.

"1. The continued use of the lumber under the facts in this case after discovery of the inaccuracy in manufacture, constitutes an acceptance thereof in the condition in which it was received, and forecloses the right to recover damages sustained because of such inaccuracy in manufacture.

"2. The plaintiff has failed to establish the proper measure of damage, and is not entitled to recover.

"3. If the plaintiff has a right to recover under the facts in this case and his damages have been correctly ascertained, then the plaintiff should recover from the defendant $147.92 and costs."

It will be observed the court did not find as a fact, from continued use of the lumber after discovery of inaccurate manufacture, and the circumstances, that plaintiff assented to take the lumber as it was in satisfaction of the seller's obligation to manufacture with exactitude. The first conclusion of law forbade recovery because of application of a rule of law to stated facts, and not because of a finding that the buyer did in fact assent to release the seller from liability. For purpose of review the findings of fact embrace all the facts established by the evidence. (*Shuler v. Lashhorn,* 67 Kan. 694, 74 Pac. 264; *Snodgrass v. Carlson,* 117 Kan. 353, 354, 232 Pac. 241.)

The word "acceptance" properly relates to the subject of passing of title.

"The proper meaning of 'acceptance' in the law of sales is an assent to become owner of specified goods offered by the seller." (2 Williston on Sales, § 482.)

In this instance the lumber was ordered, was manufactured, and was delivered to the buyer, who took possession of it, stored it in his warehouse, and paid the price. Of course the buyer accepted the lumber, whether or not it fulfilled the implied warranty of precision in dimensions. Title passed to the buyer, and if, before he commenced to use the lumber, or discovered its defective quality, it had been destroyed by fire, he would have been the loser. Acceptance by the buyer did not, however, indicate assent in fact to defective performance instead of full performance, and did not in law release the seller from liability for defective performance.

After the buyer accepted the lumber, what could he do about the seller's defective performance?

The buyer might consider the situation, and conclude he would rather make the best of it than make trouble about it, or he might

otherwise so conduct himself with reference to it as to manifest assent to receive the defective performance as satisfying the seller's obligation. Whether a buyer does this in a given case is a question of fact, and in an action by the buyer against the seller for defective performance the burden rests on the seller to establish the fact. Substantially that kind of a question was presented in the case of *Johnston v. Lanter*, 87 Kan. 32, 123 Pac. 719. In that case the buyer was sued for the unpaid portion of the price, and defended on the ground of breach of warranty of quality. The buyer's assent to receive defective performance and relinquish dependence on the seller's liability was discussed as "waiver," and the subject of delay in complaining to the seller was considered as a factor in determining the question of waiver. A statement contained in the opinion will be referred to later.

Under conditions with which we are not now concerned, the buyer might have rescinded the sale, but he was not obliged to rescind. A buyer who has accepted delivered goods which do not fulfill the seller's obligation may keep the goods and recover or recoup damages resulting from the seller's defective performance. This has been the law in this state ever since the decision in the case of *Field v. Kinnear*, 4 Kan. 476, and the rule is the same whether the buyer knew at the time of acceptance that the performance was defective, or discovered the fact after acceptance. Privilege of the buyer to keep the goods necessarily includes privilege to devote them as best he can to the use for which they were designed. The court's ruling was based on continued use after discovery of defect, not on delay in discovering the defect. There was no finding of fact that inspection was unreasonably delayed, and we are not concerned with that subject.

The court found the facts relating to complaint to the seller. It did not find as a fact that notice to the seller was unreasonably delayed, or state as a conclusion of law that notice was unreasonably delayed. The opinion in the case of *Johnston v. Lanter*, supra, contains the following statement:

"The usual rule is that on delivery the buyer must promptly inspect the goods and determine whether they meet the requirements of the contract, and if defects are found he must promptly notify the seller." (p. 36.)

Inspection and notice within a reasonable time are essential when the buyer refuses to accept, and are essential to rescission for breach of warranty in an executed sale when the goods must be

restored to the seller as a condition of relief. In other situations, failure to inspect and give notice within a reasonable time are evidential facts bearing on the question whether the buyer assented to defective performance in satisfaction of the seller's obligation, and may be very persuasive. Beyond this the opinion in the Johnston-Lanter case speaks too positively.

The uniform sales act contains a section which reads as follows:

"Section 49. [Acceptance Does Not Bar Action for Damages.] In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor." (2 Williston on Sales, § 484, and Appendix.)

Previous to adoption of the sales act it was held in New York and a few other states that with some exceptions acceptance imported waiver of claim for defective quality of goods furnished. The New York rule was a minority rule. In 2 Williston on Sales, § 488, it is said:

"The view here advocated, that acceptance of title does not as a matter of law indicate a waiver of claims for inferior quality of the goods, is supported by a large number of decisions in the United States, and is the unquestioned law of England.

"While merely taking title to the goods does not warrant the conclusion that the buyer has agreed to take the goods in full satisfaction of all of the seller's obligations, the retention and use of the goods for a considerable period without any complaint warrants a strong inference either that the goods are what the contract called for, or that the buyer has agreed to accept them instead of such goods, especially if payment of the price is made without objection. Accordingly in many of the decisions to which reference has been made, stress is rightly laid on the importance of accepting under protest or giving prompt notice of defects. But in other jurisdictions this seems less insisted upon." (pp. 1269, 1270.)

It thus appears that the statement in the opinion in the Johnston-Lanter case is in accord with section 49 of the sales act, in that it makes "prompt," that is, reasonable, notice a legal requirement, and leaves open the one question of fact, What, under the circumstances, is a reasonable time? In view of the confused state of the common law, the statement in the Johnston-Lanter opinion was in advance of the common law. This court has based no decision definitely on the proposition that when title has passed and the seller is under no risk

respecting the goods, notice to the seller of defective performance within a reasonable time after the buyer knows or should know of the breach, is in law a condition precedent to recovery or recoupment of damages. No declaration can now be made either approving or disapproving such a rule. In this instance the findings of fact show that while notice was delayed the notice given was specific, was recognized and fully acted on by the seller, every purpose of notice was fulfilled, the seller suffered no detriment from the delay, and he is in no position to complain of it.

It is not conceivable that the court regarded the findings of fact as so persuasive that no inference of fact could be drawn from them except the inference that the buyer tacitly agreed to take the defective performance as full performance, and for that reason held as a matter of law that right to damages was foreclosed. In view of what has been said the findings of fact warranted judgment for plaintiff for damages properly proved. The result is the first conclusion of law is unsound.

Plaintiff's damages consisted in the difference in value between the performance promised and the defective performance. In case of breach of implied warranty this difference is ordinarily the difference in value between the article promised and the article furnished; but consequential damages may also be recovered, such as the value of time and labor expended in reasonable effort to make use of the article furnished. (2 Williston on Sales, § 614; *Isaacs v. Motor Co.,* 108 Kan. 17, 193 Pac. 1081.) In this instance plaintiff utilized the defective material in making frames of inferior quality, which apparently he sold without loss. By this means he minimized his damages to such an extent he was out nothing but the increased expense of making frames. That item of damage was recoverable, and the second conclusion of law is unsound.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for plaintiff on the findings of fact and the third conclusion of law.