No. 47,365

Kent Brunner and Michael Beltz, *Appellees*, v. Harlan Jensen, *Appellant.*

(524 P. 2d 1175)

Opinion filed July 17, 1974.

*Kenneth E. Peery,* of Concordia, argued the cause and was on the brief for the appellant.

*Max M. Hinkle,* of Abilene, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

KAUL, J.: This is an action to recover damages for the breach of an express warranty arising from the sale of a breeding herd of cattle on an oral sales contract consummated on February 20, 1972. The herd consisted of fifty-five Hereford cows and three bulls. In their amended petition plaintiffs alleged that defendant expressly warranted that all of the cows would calve before June 1, 1972; that fifteen of the cows were not pregnant; and that ten would not calve until five or six months after June 1, 1972.

The case was tried to a jury which returned a verdict in favor of plaintiffs in the amount of $3,625.00 which reflected the difference in value of the twenty-five cows in question, because of their condition, to be $145.00 per head. Posttrial motions filed by defendant were heard and denied and this appeal ensued.

Plaintiffs-appellees are neighboring young farmers and stockmen who had leased a pasture near Hope, Kansas, for the summer of 1972. Plaintiff Brunner was twenty-three years of age at the time of trial and was a high school graduate with one year of college. Plaintiff Beltz was twenty-one years of age and had lived all of his

life on his father's farm. Plaintiffs owned a few registered cows together and helped each other back and forth, but they were not partners.

Defendant Jensen lives near Concordia. He is an auctioneer and cattle dealer and testified that he had been in the business all of his life. He conducted his cattle dealings at his ranch. Jensen purchased the herd in question from Lynn Buckland, a farmer and stockman, on or about February 9, 1972. Jensen bought the herd for the purpose of resale. It was agreed with Buckland that Jensen could leave the cattle at the Buckland ranch for as long as three weeks, or until they were resold. On February 15, 1972, Jensen advertised the heard for sale in the "Grass and Grain." The advertisement was admitted into evidence and appears as follows:

"HEREFORD Cows for sale—55 choice quality; also 3 Hereford bulls. This is an entire herd. Cows 3-4-5-6 years old. Big, yellow, calving now. Phone Concordia, Ks. 913-243-2581."

Plaintiffs saw the advertisement in "Grass and Grain." Plaintiff Brunner telephoned Jensen and made arrangements to go to Concordia to look at the cattle on February 16, 1972.

Brunner testified that he and Beltz met Jensen at the Concordia sales barn and he drove them out to the Buckland ranch. Enroute to the Buckland ranch the cows were discussed as to quality and age. Jensen told plaintiffs the cows were as advertised and were three, four, five and six years old. The precise language used by Jensen in his statements concerning when the cows would calve is in dispute.

The party arrived at the Buckland ranch late in the evening. Brunner's testimony concerning their inspection of the herd is narrated and reproduced in part verbatim in the record as follows:

"When they arrived, the cattle were out in the stubble field. It was almost dark when they drove out in the field. The sun had gone down and they drove through the cows rather hurriedly. Mr. Jensen was doing the driving. He didn't know how close they could get to the cows but guessed to within 10 yards but it was a terraced field and wasn't an ideal place to look at cattle while sitting down and moving.

"They did not count the cows that day and did not know the number of cows in that field. Mr. Jensen said that one cow had calved down by the creek and they did see one cow and a calf down off away from the rest of the herd. There were no other people in the vicinity at this time. There was a discussion about the pregnancy of the cows. They asked Mr. Jensen if the cows had been pregnancy tested. He said no, there wasn't any need to. They didn't discuss it a whole lot more at that time but then they kept coming back to the subject

of pregnancy. Mr. Jensen told them that there wasn't any need to pregnancy check, that he'd guarantee the cows would all calve by June the 1st. They took his guarantee and word for it.

"They did not specifically request or demand that the cows be pregnancy tested before purchasing them but they questioned why Mr. Jensen didn't want to test them. Mr. Jensen said that this was too much trouble and would hurt the cows.

"Q. Would you tell the jury what Mr. Jensen said about guaranteeing the cattle specifically in his words as best you recall?

"A. He said, 'I'll guarantee these cows will all calve by the 1st of June or I'll make it right with you.'

"He was not really able to tell in his own mind from looking at the cows whether the cows were pregnant or not. He was taking Mr. Jensen's word for it and so he assumed they were pregnant.

"He thinks he explained to Mr. Jensen the reason they were buying the cows. Mr. Jensen knew that they needed more cows to fill a pasture contract. They were not buying the cows to resell but to expand their herd and so they wanted more cows. Traders buy cattle to resell at a profit. Mr. Jensen told them that he had always bought calves from Mr. Buckland and had sold some for him. He also told them that he was doing this for Mr. Buckland as a favor because Mr. Buckland wanted to get out of the cow business.

"The gestation period for a cow is about 282 days."

After viewing the herd, plaintiffs and Jensen returned to the Concordia sales barn where the sale was negotiated at a price of $345.00 per head. Brunner gave Jensen a check for $1,200.00 as a down payment.

On February 20, 1972, plaintiffs went back to Concordia paid the balance of the sale price to Jensen and took delivery of the herd with the exception of the oldest of the three bulls, which by agreement was sold back to Jensen. Three cows had calved by this time. The herd was transported to plantiff's farms and. the animals divided between the two purchasers. Brunner took twenty-eight cows, two bulls and one calf. Beltz took twenty-seven cows and two calves. Plaintiffs testified that at all times pertinent the cows were kept separate from all other cattle owned by either of them.

Brunner testified that he tended the cows in his corral, seeing them perhaps three of four times a day. After two or three days he noticed that one or two cows showed signs of "coming in heat." Brunner told Beltz who said he also had a cow or two "come in heat." On Friday, February 25, five days after delivery, Brunner telephoned Jensen and told him that some cows had "come in heat." Jensen responded that he would talk to Buckland and then "get back with them [plaintiffs] in a couple of days."—Jensen did not

call back. Several more cows appeared to "come in heat" and, on March 9, Brunner again called Jensen. Jensen said he had been unable to get in touch with Buckland, but would call back when he could. Not hearing from Jensen, Brunner called again on March 21 and reported that eight to ten cows had "come in heat." At this point plaintiffs decided to have the questionable cows pregnancy tested. Dr. R. L. Novak, an experienced veterinarian, tested thirty cows on March 22. He found twelve to be not pregnant; seven less than three months pregnant; and eleven pregnant. On the same day Brunner reported the results of the tests to Jensen who again said he would talk to Buckland and call back. On March 29 plaintiffs went to Concordia to see Jensen. During the conversation plaintiffs told Jensen they had learned the cows had to be Bangs (Brucellosis) tested and Jensen agreed to pay the cost of a Bangs test. Concerning the results of the pregnancy test, plaintiffs testified that Jensen said he would make it up to them, he did not have the money at the time, but would get in touch with them in a few days. On April 4 plaintiffs had all of the cows Bangs tested and at the same time had twelve more cows pregnancy tested. Of the twelve tested, Dr. Novak found three were not pregnant and three less than three months pregnant. Brunner again telephoned the results to Jensen who informed Brunner that he wanted to look at the cows and that he and Buckland would come to Brunner's place the following Saturday to examine the cows. Brunner testified they penned the cattle in separate groupings according to the stage of pregnancy, as determined by Dr. Novak's tests, in preparation for inspection by Jensen and Buckland. Jensen and Buckland did not show up. Brunner called Jensen again on April 8 or 9 and also on April 18. As to the last call, Brunner testified that Jensen said he would have the money the first of the following week and would get in touch with plaintiffs then. Neither Jensen nor Buckland ever came to Hope to inspect the cows. Both Brunner and Beltz testified that as the cows were pregnancy tested they were marked for identification. Brunner described the cows as weighing from 700 to 800 pounds per head, depending upon age.

Beltz testified generally as to the same facts as Brunner. His testimony of the conversation with Jensen on February 16, concerning the pregnancy of the cows, is narrated as follows:

"They learned that night that the cows had not been pregnancy tested and Mr. Jensen did not want to go through the trouble of getting them in. He said the cows were pregnant, were too close to calving to be treated like that.

He didn't want to handle and move them. Mr. Jensen guaranteed them several times that if they didn't calve by the 1st of June, he'd make it right. *They bought the cows without any pregnancy test because they were taking his word of guarantee.*

"They told Mr. Jensen that they were building up their herd. It did not occur to them to have the cows pregnancy tested because they were taking the guarantee. He could not recall specifically what Mr. Jensen said how the guarantee would be made good." (Emphasis supplied.)

On cross-examination Beltz again testified that plaintiffs were relying upon Jensen's statement that the cows were bred to calve by June 1.

In his testimony Dr. Novak described the procedure of a pregnancy test and further stated that in his testing he found no signs of abortion by any of the cows. He testified there was no danger to the cow or unborn calf in pregnancy tests if the tester used discretion and care. He was positive in his testimony with respect to the cows found not pregnant. Concerning those cows that he found to be less than three months pregnant, the determination was described as relatively close, but could have been off a month or six weeks. With even a variance of six weeks a cow tested on March 22, and found to be less than three months pregnant, could not have calved before August 1, or July 15 at the earliest. Dr. Novak also recited the various ways in which bulls lose their fertility.

Joe Clemence, a farmer and livestock auction operator, testified that on February 16, 1972, 800 pound Hereford butcher cows were selling for eighteen to twenty-six cents per pound and cows suitable for slaughter were averaging twenty-three to twent-six cents per pound. He testified that prices rose between February and June of 1972, and the price of a 1000 pound Hereford might have been twenty-seven cents a pound by June, but because of the price spread between the high and low price per pound slaughter cows could have still been worth twenty-five cents per pound on June 1, 1972.

The defendant's evidence consisted of the testimony of Mr. and Mrs. Jensen, Lynn Buckland and Kenneth Stielow, an Area Extension Economist in Farm Management for Kansas State University, who lived in Concordia.

Buckland testified as to how he handled the herd while it was in his possession and that bulls were out with the cows the first of May 1971, and that he saw no activity indicating a cow was in heat after August 1, 1971. He stated that during the previous year every cow had produced a calf.

Mr. Stielow testified that he was familiar with Buckland's cow herd and that he was present when the cows were loaded on February 20, 1972. Stielow said the cattle were extremely difficult to load and that whips and prods were used extensively. He said that when the cows were loaded some were not as noticeably pregnant as those that were extremely heavy with calf; he did not think that any appeared not to be pregnant.

Jensen's testimony was in direct conflict with that of plaintiffs in several respects. Even though both of the plaintiffs testified that he had used the term "guarantee" several times in the course of negotiations of the sale, defendant insisted that he had never used it and that he had simply told plaintiffs the cows were bred to calve by June 1 and would calve out by then outside of maybe one or two stragglers that might be a little late. His version of the telephone conversations were considerably different from that given by Brunner. Jensen testified that he offered to take the entire herd back on March 29, 1972. This was specifically denied by Brunner in his testimony on rebuttal.

Several of defendant's points on appeal relate to the interrogatories submitted to the jury and the answers thereto which appear in the record as follows:

"1. Did defendant, in selling cows herd to the plaintiffs, *expressly warrant that all cows would calve by June 1, 1972?*

"ANSWER: *Yes*

"2. If the answer to # 1 is 'yes', state the words used by defendant in making said warranty.

"ANSWER: *Bred to calve by June 1, 1972.*

"3. If the answer to # 1 is yes, did the plaintiffs purchase the cows in sole reliance upon the words used by defendant in making the warranty?

"ANSWER: yes.

"4. Were the cows in question with calf on the date they were sold and delivered to the plaintiffs?

"ANSWER: No

"5. Were the cows in question bred to calve by June 1, 1972?

"ANSWER: No

"6. How many of the cows in question calved by June 1, 1972?

"ANSWER: Three as we can recall

"7. If the answer to # 1 is yes, did the defendant breach said warranty?

"ANSWER: Yes

"8. Did the plaintiffs promptly and within a reasonable time inspect the cows in question for any deficiencies as to their conformity with the warranty?

"ANSWER: Yes

"9. When did the plaintiffs notify the defendant that the cows failed to conform to the warranty?

"ANSWER: 4 to 5 days

"10. Was the defendant notified within a reasonable time after the warranty was breached?

"ANSWER: Yes

"11. What was the average value per head of the cows in question at the time of sale for those animals which

"(*a*) calved by June 1, 1972? *$345.00*

"(*b*) did not calve by June 1, 1972? *$200.00*" (Emphasis supplied.)

Defendant's first contention on appeal is that the words "bred to calve by June 1, 1972," stated by the jury in its response to interrogatory No. 2, do not, as a matter of law, constitute an express warranty. Defendant asserts that there is a significant difference between a statement that cows were "bred to calve" by a certain date and a statement that cows would, in fact, calve by a certain date. Defendant stresses the fact that the jury did not find that defendant used the word "guarantee." There is no basis for defendant's argument since the jury was not asked whether the word "guarantee" was used. To infer from the jury's answers that the word "guarantee" was not used would be pure speculation.

Defendant strenuously argues that the statement "bred to calve by June 1," must be considered only as the expression of an opinion and cannot be said to rise to the level of an express warranty. Defendant cites the case of *McCullough v. Bales,* 125 Kan. 670, 265 Pac. 1110, in support of his position and argues that the language found by the jury to have been used in the instant case leaves the case under the rule which he claims to have been established in *McCullough* and takes the case out of the rule of *Naaf v. Griffitts,* 201 Kan. 64, 439 P. 2d 83, upon which plaintiffs rely.

The statement in *McCullough,* upon which the defendant bases his argument, appears on page 672 of the opinion as follows:

". . . *But unless covered by an express warranty* a statement as to when a cow will calve is only an expression of opinion. In *Smith v. Johns et al.,* 113 Ore. 351, one of the headnotes reads:

" 'Statement by seller of dairy cows as to time when cows become "fresh" held not ground for rescission, being merely the statement of an opinion.' " (Emphasis supplied.)

While defendant makes a persuasive argument on this point in his carefully written brief, we are constrained to believe he overlooks several significant aspects in his analysis of the *McCullough* and *Naaf* decisions. The *McCullough* case dealt with issues pertaining to implied rather than express warranties. The action was brought by the buyer of a cow to recover the purchase price and incidental costs. The cow in question died in the possession of the

buyer some three months after delivery. The cow had bloated on alfalfa a few days before delivery and had to be "tapped." The plaintiff buyer was apprised of this fact when he came for the cow and the seller offered to release him from his bargain; the buyer, nevertheless, took the cow and paid the purchase price. No ill effects flowed from the bloating and tapping, but a few weeks later the cow became ill and died. A veterinarian's post-mortem examination revealed the cow's stomach to be laden with "nails, 22 rifle cartridges, bailing wire and other metals." The wires had penetrated the stomach wall and one wire had entered the lining of the cow's heart. Plaintiff buyer sued and the case was tried in court. In his petition the buyer alleged the presence of the metal objects in the cow's stomach and that the seller had *represented* the cow would calve in March 1926, and had *warranted* and guaranteed the cow would breed and that all of which was untrue. The trial court held for the seller. On appeal the determinative holding of this court was that there is no implied warranty of soundness when the unsoundness is hidden and unknown to the seller. The Oregon case (*Smith v. Jones et al.*, 113 Ore. 351), from which the statement relied on by defendant herein was taken, was a suit to rescind the sales contract of a dairy herd on the grounds of fraudulent misrepresentation as to a mortgage encumbrance on the herd. The only reference to a statement by the seller as to when the cows would become "fresh" was that such statement was not grounds for rescission.

A representation as to when a cow would calve was considered in context in the *McCullough* opinion that it could not serve as a basis for an implied warranty under the evidence therein. By inserting the words "but unless covered by an express warranty" the court recognized a distinction when there is evidence that such a statement is made as, or covered by, an express warranty. This is the interpretation given to *McCullough* in our opinion in *Naaf*.

The *Naaf* case dealt with the issue of the existence of an express warranty stemming from a newspaper advertisement stating that certain heifers for sale would calve in September or October, coupled with the seller's oral statement that the heifers had been pregnancy tested and other statements of the seller. The trial court found the statements amounted to a warranty that the heifers were seven to eight months pregnant. On appeal this court affirmed, relying largely upon our holding in *Adrian v. Elmer*, 178 Kan. 242, 284 P. 2d 599. In *Naaf*, the seller, as defendant does in the instant

case, argued on appeal that the trial court erred in holding the advertisement and oral statements constituted an express warranty, rather than expressions of opinion. On this point, Justice O'Connor speaking for the court had this to say:

"The defendant first urges the trial court erred in holding the advertisement and oral statements of the defendant constituted an express warranty rather than expressions of opinion. The defendant relies on what was said in *McCullough v. Bales*, 125 Kan. 670, 265 Pac. 1110, to the effect that a statement as to when a cow will calve is only an expression of opinion. A careful reading of the case, however, reveals that the principle is applicable only in the absence of an express warranty." (p. 66.)

Defendant attempts to distinguish *Naaf* from the case at bar in that in *Naaf* the seller misrepresented that a pregnancy test had been made. In the instant case there is testimony by plaintiffs that they wanted a pregnancy test, but defendant refused on the grounds it was unnecessary and would be harmful to the cows. Defendant admitted that he refused to have a pregnancy test made. On this point, defendant's testimony is narrated in the record:

"During the negotiation between the plaintiffs and himself, the plaintiffs did talk about the fact that they wanted them pregnancy checked but he wouldn't allow it. He refused to have the cattle pregnancy checked. He told them if they wanted to buy the cows the way they were, that was fine, but otherwise he had other guys that would buy the cows. It is too hard on cows to jam them through the chutes used for pregnancy tests."

Defendant also admitted that a person buying a cow for $350.00 would be out about $150.00 if the cow turned out to be without calf.

While the oral statement of the seller in *Naaf* that the heifers had been pregnancy tested is absent in the instant case, a careful reading of *Naaf* clearly indicates that a statement as to time of calving made under supporting facts and circumstances may be treated as an express warranty, rather than the mere expression of an opinion.

Whether a seller's statements concerning the condition of animals are to be treated as a warranty or an expression of opinion is not a new or novel subject before this court. In addition to the cases heretofore mentioned the question was considered in the recent case of *Young & Cooper, Inc. v. Vestring*, 214 Kan. 311, 521 P. 2d 281, wherein all of the cases dealing with the subject, including those mentioned herein, are reviewed in the light of relevant sections of the Uniform Commercial Code. In the *Vestring* case the issue concerned statements made by the seller as to the condition of a cattle herd consisting primarily of Blank Angus cows. The case dealt with the existence of either an express or implied warranty, or both. With respect to an express warranty we held:

"Under the Uniform Commercial Code an express warranty by the seller is defined as any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis for the bargain. This creates an express warranty that the goods shall conform to the affirmation or promise. (K. S. A. 84-2-313 [1] [a].)

"Where facts or affirmations relied upon to prove an express warranty rest wholly in parol, it is the province of the jury to determine whether they amount to an express warranty.

"It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty. (K. S. A. 84-2-213 [2].)" (Syl. ¶¶ 1, 2 and 3.)

Particularly applicable to the facts in the instant case is our holding in paragraph 6 of the syllabus which reads:

"Under the Uniform Commercial Code any description of the goods which is made a part of the basis of the bargain creates an express warranty that the goods shall conform to the description. (K. S. A. 84-2-313 [1] [b].)"

In the case at bar, plaintiffs allege in their petition that defendant expressly warranted the cows would calve by June 1, 1972; that they relied upon defendant's warranty; and that they were thereby induced to purchase the cows for the price paid. The case was tried, submitted to the jury and determined by it on the issue of the existence of an express warranty. The jury found (interrogatory No. 3) that plaintiffs purchased the cows in sole reliance upon the words used by defendant; thus, making his statement a part of the basis of the bargain. (*Young & Cooper, Inc. v. Vestring,* supra.) The jury was instructed in instruction No. 8 that the warranty claimed by plaintiffs was that the cows would calve before June 1. In instruction No. 10 the jury was instructed that if defendant did not expressly warrant the cows to calve as claimed by plaintiffs or that if so warranted, there was no breach or no timely notice of such breach, then the jury must find for defendant. In other words, the jury was definitely and specifically instructed that it must find that defendant expressly warranted the cows would calve before June 1 in order that plaintiffs recover.

Turning to the jury's answers to interorgatories, it found in No. 1 that defendant expressly warranted that all cows would calve by June 1. Considering the language used in interrogatory No. 1 the jury's answer thereto fully supports, and is consistent with, the general verdict. It is true, the answer given by the jury in answering

interrogatory No. 2 is not couched in the same words as those used by the court in interrogatory No. 1. However, it is clear the jury found an express warranty was made, whether it was that the cows would calve by June 1, or were bred to calve by June 1, the jury found the warranty was breached. In answers to Nos. 4 and 5 the jury found the cows in question were not with calf and were not bred to calve by June 1. Reading the language of the interrogatories and answers on this point in the light of the evidence adduced, the court's instructions and the general verdict, we were unable to find inconsistency which compels the direction of a new trial. Special findings are to be liberally construed on appeal and interpreted in the light of the testimony with the view of ascertaining their intended meaning. (*Bott v. Wendler*, 203 Kan. 212, 453 P. 2d 100; *Sheeley Baking Co. v. Suddarth*, 172 Kan. 533, 241 P. 2d 496; and *Lee v. Gas Service Company*, 166 Kan. 285, 201 P. 2d 1023.) Where there is a view of the case that makes the jury's answers to special interrogatories consistent they must be resolved that way. (*Rohr v. Henderson*, 207 Kan. 123, 483 P. 2d 1089.) Viewing the jury's findings Nos. 1, 2, 4 and 5 in the light of the foregoing rules it must be concluded the jury found defendant expressly warranted the cows were bred to calve by June 1, 1972, and would calve on or before that date.

The record discloses that on hearing posttrial motions the trial court carefully examined the point raised by defendant and ruled:

". . . Now, it is always possible to take parts of testimony, parts of any matter, out of context, but putting the whole context in perspective, the Court finds that the written interrogatories answered by the jury are not inconsistent with each other and the general verdict. The Court approves the general verdict, and the motion for judgment notwithstanding verdict will be overruled. The motion for new trial will be denied."

We find no reason to disturb the trial court's rulings in this regard.

Defendant advances several arguments attacking the sufficiency of the evidence to support various findings of the jury. While, as we have indicated, the evidence was in conflict on several issues, the record discloses substantial evidence to support each of the jury's findings; hence, under well-established rules of appellate review they are to be accepted as true and will not be disturbed on appeal. The applicable rules are set forth in *Robles v. Central Surety & Insurance Corporation*, 188 Kan. 506, 363 P. 2d 427, wherein we held:

"The supreme court does not sit as a trier of the facts, and upon appellate review accepts as true the evidence and all inferences which support, or tend to support, the special findings, verdict, and judgment below, and disregards any conflicting evidence or other inferences which might be drawn therefrom. If there is any evidence to sustain the special findings, verdict, and judgment, they cannot be set aside. It only is necessary to consider whether there is substantial evidence upon which the special findings, verdict, and judgment are based, and a consideration or recital of the contradictory evidence cannot aid in correctly determining that question." (Syl. ¶ 1.)

See, also, *Morris v. Hoesch,* 204 Kan. 735, 466 P. 2d 272; and *Renner v. Monsanto Chemical Co.,* 187 Kan. 158, 354 P. 2d 326, and the many cases cited therein.

What has been said disposes of defendant's contention concerning the sufficiency of the evidence; however, we deem several points deserving of further comment. Defendant contends there was not sufficient evidence to show that plaintiffs relied solely upon the statement of defendant found by the jury to be a warranty. The elimination of the element of reliance in an action for breach of an express warranty by the Uniform Commercial Code was pointed out in *Young & Cooper, Inc. v. Vestring,* supra, where we said:

"An express warranty by definition in 84-2-313 (1) (*a*), supra, makes it contractual and particular reliance upon the express warranty need not be shown. The Kansas comment to the foregoing section of the code says the definition is simplified by elimination of the element of reliance. (See *Topeka Mill & Elevator Co. v. Triplett* [168 Kan. 428, 213 P. 2d 964], *supra.*)

"Official U. C. C. Comment under the foregoing section of the act indicates that in actual practice affirmation of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement." (p. 324.)

The trial court's instruction on reliance and the submission of interrogatory No. 3 actually placed a heavier burden upon plaintiffs than that required under present law. However, the testimony of plaintiffs constituted ample evidence to support the jury's finding in this case.

Defendant also claims insufficient evidence to support the jury's findings that plaintiffs promptly inspected the cows and notified defendant within a reasonable time of the breach of warranty. Defendant was notified within a week that both plaintiffs had cows in heat. Such evidence adequately supports findings of prompt inspection and timely notice. Whether a buyer notifies a seller of a breach of warranty within a reasonable time is a ques-

tion of fact to be determined from all the facts and circumstances. (*Naaf v. Griffitts,* supra; and *Martin v. Scott Lumber Co.,* 127 Kan. 391, 273 Pac. 411.) In *Naaf,* notice was given sixty days after discovery, this court said whether the delay was reasonable was a question for the trial court and its finding on the point could not be disturbed on appeal. In the instant case the questions of prompt inspection and notice were submitted to the jury under proper instructions and there was evidence to support its findings; thus, the findings will not be disturbed on appeal.

Defendant also contends that plaintiffs failed to sustain their burden of proof with regard to the absence of any act or omission on their part which may have caused the cows to abort their calves. We have recited the plaintiffs' testimony as to the separate penning of the cows; that they were not handled roughly; that they were fed properly and not given any stilbestrol or any feed that would cause them to abort. Dr. Novak testified the cows were healthy and he found no evidence of abortion. Defendant offered no direct evidence to the contrary, he merely raised the speculation that something could have happened to make the cows abort after plaintiffs took possession.

Defendant next claims error in the court's instruction on measure of damages. The court instructed substantially in the form of PIK [civil] 13.16. The instruction given complies with the rule stated in *Naaf v. Griffitts,* supra, and previous cases, and conforms with the provisions of K. S. A. 84-2-714 of the Uniform Commercial Code.

Defendant further claims error in regard to damages by asserting that by its response to interrogatory No. 6 that three cows had calved by June 1—the jury showed that it was confused in ascertaining the amount of damages. When confronted with this argument on motion for a new trial, the trial court responded:

". . . As pointed out by counsel for the plaintiffs, No. 6 found that three of the cows, as they recalled, calved by June 1, 1972, and perhaps the Court shouldn't have submitted that question, because that was not the issue in this case, it was how many did calve. So that answer, so far as the Court is concerned, is meaningless to the matter before the Court at this time. . . ."

Undoubtedly, the jury made its response to No. 6 on the evidence that three cows had calved by the date of delivery on February 20, 1972. In this respect the jury was confused, but, as the trial court pointed out, the interrogatory should not have been submitted since it was irrelevant; the real question in the case being how many cows did not calve. Since the interrogatory did not go to an issue in the

case, the jury's answer cannot rise to the level of reversible error.

We have carefully examined all of defendant's complaints concerning the matter of damages and find none that would justify a reversal of the judgment.

Finally, defendant claims error in the trial court's refusal to submit his requested instruction No. 8 which, in effect, would have told the jury that the case was one of express warranty only and not a case of implied warranty of suitability for the purpose for which the cows were purchased. As previously indicated, this case was pleaded, tried and submitted strictly on the issue of the existence of an express warranty. There was no mention of a theory of implied warranty at the pretrial conference or at any other stage of the proceedings. The trial court fully instructed the jury as to the law regarding the creation of an express warranty. To interject implied warranty of suitability for a particular purpose into the instructions when it was not raised in the pleadings or during the trial would have undoubtedly confused the jury and potentially, at least, would have amounted to error.

We have carefully examined all of defendant's complaints concerning instructions and find nothing in this connection which rises to the level of reversible error.

We conclude with the observation that this was essentially a fact case, which was fully tried; that the special findings and general verdict were not inconsistent with each other and were amply supported by evidence which the jury chose to believe. The judgment of the trial court is based upon those findings and verdict and it should be and is hereby affirmed.

It is so ordered.